Robert E. **FENER**, Plaintiff,

v.

James **HUNT** and Mike Dombeck, Defendants.

Civil Action No. 97–0024–L.

United States District Court, W.D. Virginia, Lynchburg Division.

June 24, 1997.

Robert E. Fener, Washington, DC, pro se.

Julie C. Dudley, U.S. Attorney's Office, Roanoke, VA, Kelly E. Mofield, U.S. Dept. of Justice, Washington, DC, John Ebersole, Office of General Counsel, Dept. of Agriculture, Atlanta, GA, for Defendants.

### MEMORANDUM OPINION

KISER, Senior District Judge.

The plaintiff is the owner of 95 acres of land that is surrounded by the George Washington National Forest ("GWNF" "the forest"). The plaintiff's land is near several cutting units for the proposed Rucker Lap timber sale ("the timber sale" "proposed timber sale"). The plaintiff has filed suit against the defendants, alleging that the timber sale violates the National Forest Management Act, 16 U.S.C. § 1600–1604 ("NFMA"), and the National Environmental

Policy Act, 42 U.S.C. § 4321 *et seq.* ("NEPA").[1] The plaintiff requests review of the U.S. Forest Service's decision to implement the sale. pursuant to the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.* ("APA"). The plaintiff has filed a motion for preliminary injunction to prohibit the Forest Service from executing the timber sale. The defendants have filed a motion for summary judgment, claiming there is no dispute of material fact and the Forest Service's decision to implement the timber sale should be affirmed.

The parties have fully briefed the issues involved and have presented oral argument. The motions are, therefore, ripe for disposition. For the reasons contained herein, I am of the opinion that the defendants' motion for summary judgment should be granted and the plaintiff's motion for preliminary injunction should be denied.

### I. FACTS

The plaintiff is the owner of 95 acres of land off FS 38, approximately 2.2 miles south of Route 60 in Amherst County, Virginia. Plaintiff's land is surrounded by the GWNF and is approximately 200 feet from cutting unit two of the proposed timber sale. Defendant Hunt is the District Ranger for the Pedlar Ranger District in the forest. Hunt signed the Decision Notice and Finding of No Significant Impact ("DN/FONSI") for the timber sale. Defendant Dombeck is the Chief of the United States Forest Service, U.S. Department of Agriculture ("Forest Service"); he has ultimate responsibility for ensuring that Forest Service policies are sound and in compliance with applicable statutes and regulations.

The GWNF encompasses about 1,061,000 acres of land in Virginia and West Virginia; the forest is managed by the Forest Service pursuant to 16 U.S.C. §§ 473 *et seq.* The Forest Service manages the GWNF pursuant to a Land and Resource Management Plan ("LRMP"). The LRMP divides the GWNF into 18 management areas; of these areas,

---

**1.** The parties have stipulated to dismiss without prejudice plaintiff's claims under the Migratory Bird Treaty Act, 16 U.S.C. § 703 ("MBTA").

only Management Area 17 ("MA 17")—which covers about 9 percent of the forest—is designated for special emphasis on timber production. The timber sale is located within MA 17.

In January 1995, notice of the proposed timber sale was mailed to interested members of the public, including the plaintiff. The plaintiff was among the people to comment on the proposal. During the review process, the Forest Service considered several alternative approaches to the timber sale, including Alternative 2—the alternative finally selected—and a "no action" alternative. The Forest Service prepared an environmental assessment ("EA") for the sale; the EA discusses relevant environmental issues. Following the completion of the EA, the Forest Service decided to not prepare a more detailed environmental impact statement ("EIS") on the project. The EA was made available for public comment. After responding to specific comments, Hunt issued the DN/FONSI in February 1996.

Alternative 2 provided for the harvesting of 47 acres in two cutting units (units 2 and 5) using the modified shelterwood cutting method. This method is designed to regenerate a new stand of trees of roughly the same age, while leaving a partial forest canopy. Cutting unit two, comprising 26 acres, is immediately east of the plaintiff's property. Alternative 2 also provided for thinning operations on another 59 acres (units 1, 3, and 4).

The plaintiff filed an administrative appeal of the DN/FONSI. Robert Joslin, the regional forester and appeal officer, denied plaintiff's appeal by letter of June 7, 1996; Joslin concluded that all the issues raised by the plaintiff had been adequately addressed and that the environmental analysis disclosed in the EA supported a finding of no significant impact on the quality of the human environment. This was the final administrative determination of this issue.

In the amended complaint filed on April 30, 1997, the plaintiff alleges the Forest Service's decision with respect to the timber sale is arbitrary and capricious for the following reasons:

1. *Count 1:* Failure to consider cumulative effects.

2. *Count 2:* Community opposition.

3. *Count 3:* Failure to consider aesthetic and visual effects.

4. *Count 4:* Failure to properly address archeologically significant sites.

5. *Count 5:* Erroneous analysis of climactic considerations.

6. *Count 6:* Erroneous analysis of hydrological considerations.

7. *Count 7:* Erroneous analysis of regeneration/accessibility considerations.

8. *Count 8:* Erroneous analysis of ecological considerations.

9. *Count 9:* Failure to give good faith consideration to the no action alternative.

## II. MOTION FOR SUMMARY JUDGMENT

### A. SUMMARY JUDGMENT STANDARD FOR REVIEW OF AGENCY DECISIONS

■ Summary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c). Where the court reviews the decision of an administrative agency, the summary judgment motion "stands in a somewhat unusual light, in that the administrative record [supplemented by the evidence that I have allowed the plaintiff to submit] provides the complete factual predicate for the court's review." *Krichbaum v. Kelley,* 844 F.Supp. 1107, 1110 (W.D.Va.1994). Because the factual record is closed, the "plaintiff's burden on summary judgment is not materially different from his ultimate burden on the merits." *Id.* "To survive summary judgment, then, the plaintiff must point to facts in the administrative record—or to factual failings in that record—which can support his claims under the governing legal standard." *Id.*

■ The APA requires that the agency's determinations not be disturbed unless they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A). The court is to determine whether "the [agency]

decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). The agency's actions are "presumed to be lawful and correct" and the court must give "due deference to the agency's expertise and judgment." *Sierra Club v. Robertson*, 810 F.Supp. 1021, 1025 (W.D.Ark.1992). The arbitrary and capricious standard is "not altered by the more substantive statutes which underlie the APA claim." *Krichbaum*, 844 F.Supp. at 1110.

### 1. NEPA Claims

 Under NEPA, a federal agency must prepare an EIS for a major federal action "significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). To determine whether an EIS must be prepared, the agency may first prepare an EA. 40 C.F.R. §§ 1501.3, 1508.9 (1996). An EA is a rough-cut, low-budget EIS that is designed to show whether a full-fledged EIS is necessary. *See Krichbaum*, 844 F.Supp. at 1111. An agency's decision that a full-fledged EIS is not necessary because the proposed action will have no significant impact is subject to arbitrary and capricious review. *See id.* In this context, the court must evaluate whether the agency took a "hard look at the environmental consequences and ... whether its conclusion was based upon a good faith judgment, informed by the relevant factors." *Id.*

### 2. NFMA Claims

The NFMA guides the Forest Service in managing federal lands. NEPA regulations are applicable to NFMA. *See* 16 U.S.C. § 1604(g)(1).

Under NFMA, the Forest Service is required to formulate a LRMP for each land area. The timber sale documents incorporate the LRMP by reference. The plaintiff has not challenged the LRMP.[2]

### B. FAILURE TO CONSIDER CUMULATIVE EFFECTS (COUNT 1)

The plaintiff claims that: (1) the research done for the timber sale was inadequate in its narrow focus and failed to consider the cumulative effects of the Forest Service's actions; (2) an environmental impact statement was not performed; (3) no cost-benefit analysis was projected for the no action alternative; (4) the approved Alternative 2 fails to justify a below-cost timber harvest, particularly given that the need for the wood has not been established; (5) the plaintiff offered to buy the trees adjacent to his property, but the Forest Service refused to consider this option; and (6) the Forest Service has an institutional bias that favors even-aged cutting methods despite the fact they are legally and ecologically disfavored. I will address each of these claim in turn.

 *Assessment of cumulative impact.* The plaintiff does not identify which cumulative impacts the Forest Service failed to review. The LRMP clearly addresses the past, present, and future condition of the GWNF. The EA addresses the impact of the timber sale on soil and water quality, cultural resources, visual quality, wildlife, and climactic concerns, among other things. The EA notes that cumulative effects of past timber harvests were considered in the analysis and the cumulative effects of the timber sale upon soil and water resources would not be significant. The plaintiff points to no specific facts which would indicate cumulative effects were not considered. To stop all action in the GWNF while every conceivable effect is considered and catalogued would be unreasonable and an improper use of resources. The Forest Service has given sufficient consideration to cumulative effects.

 *Decision to not prepare an EIS.* The plaintiff alleges that an EIS would have brought to light a more accurate image of

---

**2.** The plaintiff states that he did not participate in the LRMP because the notice concerning public involvement in the LRMP appeared in the *Federal Register.* The plaintiff claims that he should not be reasonably expected to monitor the *Federal Register.* The *Federal Register* is a means

of consolidating federal agency notifications, so that the public will have access to government material. To impose additional burdens on what federal agencies must publish in local newspapers would be an onerous requirement, one that is beyond the proper jurisdiction of this Court.

the proposed harvest. Clearly, putting more resources into such a study would bring forth additional data. However, the plaintiff can only speculate that an EIS would change the Forest Service's decision to proceed with the timber sale. Extensive documentation supports the LRMP and the EA. As Hunt indicated in the DN/FONSI, his decision to not proceed with an EIS was supported by consideration of environmental effects (including physical and biological effects, wildlife habitat, soil production, and water quality), public health and safety, unique resources (such as old growth stands), controversy, unknown risks, cumulative effects, cultural resources, and endangered species. I find that the decision to not prepare an EIS is adequately supported by the record and not arbitrary and capricious.

■ *Evaluation of no action alternative.* Based on a review of the administrative record, I find that the no action alternative was considered by the Forest Service. This alternative was one of the three alternatives that was included in the EA. The plaintiff does not contest the Forest Service's claim that it would have terminated the timber sale if, at some point in the analysis, the no action alternative was the most appropriate decision. Moreover, the Forest Service has pointed to substantial evidence that a no action alternative would not meet the purposes and needs of the GWNF management program. The LRMP points out that the objective of MA 17 is to provide a "balanced age-class distribution of forest stands containing native tree species capable of sustained, high value timber production." Administrative Record ("A.R.") Tab 1 at 3–88. MA 17 is to be "more intensively managed for timber using even-aged and uneven-aged timber cutting methods." *Id.* The court in *Krichbaum* noted:

[A non-logging alternative would] signal a wholesale rejection of the management direction specified for this area, and more fundamentally, a rejection of multiple-use principles as developed by the agency. So long as Congress requires [the GWNF] to be managed with multiple-use principles, portions of the Forest must embody a com-

promise between "natural" Forest conditions and the need for Forest resources—consistent, of course, with NFMA's substantive commands. Unless it acts irrationally, this compromise is the agency's to strike[.]

*Krichbaum,* 844 F.Supp. at 1119. Moreover, the Forest Service determined that the grassy openings and younger trees created by the harvest would improve the habitat for certain types of plant and animal species that the Forest Service desired. *See* A.R. Tab 79 at 23–33. The Forest Service determined that a no action alternative would result in higher incidence of disease, loss of vigor, mortality, and gypsy moth defoliation, and that the stand would be older than the desired age class. *See id.* at 22. I conclude that it was not arbitrary and capricious for Hunt to determine that a no action alternative would not have moved the area towards its desired future condition.

■ *Profitability of harvest.* The EA points out that the timber sale will not be below cost. *See* A.R. Tab 79 at 34. Moreover, the defendants indicated at oral argument that the bids coming in on the timber sale are for much more than the anticipated $50,000 in expected revenue. The LRMP notes that the Forest Service is sensitive to the issue of below-cost timber sales in instances where sales are below-cost. *See* A.R. Tab 1 at 2–12. I find that the Forest Service did not act arbitrarily and capriciously in proceeding with the timber sale.

■ *Plaintiff's offer to purchase trees and conduct mediation.* In his administrative appeal, the plaintiff alludes to an offer he made to pay the Forest Service the full market value of the trees adjacent to his property if the Forest Service would not cut the trees. *See* A.R. Tab 90 at 7 n. 5. There is no indication in the record that the plaintiff made this offer during the decision process. Moreover, the plaintiff's offer to conduct mediation was not made until *after* the administrative appeal was decided. The Forest Service has substantial discretion in its evaluation of alternatives. *See State of N.C. v. F.A.A.,* 957 F.2d 1125, 1134–35 (4th Cir.1992). The record indicates that a number of non-financial goals, such as the devel-

opment of a balanced age-class distribution of forest stands, are to be met by the sale. These non-financial goals would be frustrated by the removal of trees from Forest Service management. I find that it was not arbitrary and capricious for the Forest Service to not consider plaintiff's offer to purchase the trees. I find it was not arbitrary and capricious for the Forest Service to not consider plaintiff's offer of mediation, when the offer did not come until well after the decision process was completed.

■■■■*Choice of even-aged cutting method.* There is abundant evidence in the record that the Forest Service has thoroughly investigated the use of even-aged versus uneven-aged cutting methods. The LRMP discusses the types of sites in MA 17 that are best suited to even-aged and uneven-aged cutting methods. *See* A.R. Tab 1 at 3–89. The plaintiff did not participate in the LRMP comment process and does not challenge the LRMP in this case. The EA notes that nine areas in MA 17 been selected for uneven-aged harvest systems and that the proposed timber harvest area is to be managed with an even-aged harvest system. *See* A.R. Tab 79 at 2. Finally, the EA considered an uneven-aged harvesting alternative for this timber sale but found that the land did not meet the criteria for uneven-aged harvesting. *See id.* at 10. Other circuits are split on whether NFMA allows the use of even-aged management techniques only in exceptional circumstances. *Compare Sierra Club v. Thomas,* 105 F.3d 248, 250 (6th Cir.1997) ("[NFMA] contemplates that even-aged management techniques will be used only in exceptional circumstances") *with Sierra Club v. Espy,* 38 F.3d 792. 798–800 (5th Cir.1994) (rejecting notion that NFMA allows the use of even-aged management techniques only in exceptional circumstances). I know of no Fourth Circuit decision addressing this issue. The plaintiff points to no specific data indicting why the Forest Service's decision to proceed with even-aged harvesting methods was erroneous in this case. I find that the Forest Service has been sensitive to the use of even-aged versus uneven-aged harvesting techniques and sensitive to the effects of these techniques on the "protection of soil, watershed. fish, wildlife, recreation, and esthetic

resources, and the regeneration of the timber resource." *Espy,* 38 F.3d at 798 (*quoting* 16 U.S.C. § 1604(g)(3)(F)(v)). Accordingly, I do not find that the Forest Service was arbitrary and capricious in its decision to proceed with an even-aged harvest of the land at issue.

The defendants' motion for summary judgment is granted as to Count I of the complaint.

### C. COMMUNITY OPPOSITION (COUNT 2)

The plaintiff alleges that Alternative 2 is highly controversial, in violation of NEPA regulations. The plaintiff notes that two thousand people signed a petition opposing the timber sale, and the Forest Service refused to accept the services of a mediator to resolve the controversy.

■■■■ Contrary to the plaintiff's contention, the Fourth Circuit has expressly rejected the "suggestion that 'controversial' must necessarily be equated with opposition." *See Rucker v. Willis,* 484 F.2d 158 (4th Cir.1973). The *Rucker* court went on to note, "The term should properly refer to cases where a substantial dispute exists as to the size, nature or effect of the major federal action rather than to the existence of opposition to a use." *Id.* In the DN/FONSI, Hunt addressed the controversy of the proposed sale. I do not find the Forest Service acted arbitrarily and capriciously in deciding that the citizens petition did not amount to the significant controversy required to stop the issuance of a DN/FONSI. The defendants' motion for summary judgment as to Count 2 is granted.

### D. FAILURE TO CONSIDER AESTHETIC AND VISUAL EFFECTS (COUNT 3)

The plaintiff maintains that timber sale sites surround his property on all sides, with the most visually offensive area plainly visible from the main living areas of his house. The plaintiff alleges that the timber harvesting will adversely impact the value of his property.

■■■■ The visual impact of the project on the plaintiff was identified during the scoping process and is expressly addressed in the

EA. *See* A.R. Tab 79 at 17. The parties dispute how much of unit two is in the major viewshed of plaintiff's cabin. To reduce visual impact, the EA notes that the Forest Service will minimize visual concerns to plaintiff's property by "leaving several clumps in [unit two] and feathering the top edge of the unit." The Forest Service has also provided a buffer between the unit two harvest and plaintiff's property and has left a higher than normal basal area.

I do not find the Forest Service acted arbitrarily and capriciously either in its determination that unit two was not in the major viewshed of plaintiff's cabin or in its decision that the measures taken will alleviate the visual impact sufficient to meet the Forest Service's visual quality objectives. To require the Forest Service to create a higher standard for visual quality beyond that set out in the LRMP, *see* A.R. Tab 1 at 3–119/121, would be inappropriate, as the plaintiff does not have standing to challenge the LRMP. Accordingly, the defendants' motion for summary judgment as to Count 3 of the complaint is granted.

### E. Failure to Properly Address Archeologically Significant Sites (Count 4)

■ The plaintiff maintains the DN/FONSI fails to properly address archeologically significant sites in that the Forest Service failed to mark off all identified cultural resource sites. In his brief, the plaintiff alludes to several sites that he claims should be protected but are not.

The Forest Service conducted a detailed archeological survey in the areas impacted by the timber sale and also considered information in GWNF files, the National Register, and Amherst County census records. The Forest Service located a number of sites in the area and deleted them from the proposal. As a result of archeological concerns, one unit was deleted from the proposal and one unit's cut was modified to avoid an archaeological site. The Forest Service also identified rock piles and terraces and worked to mitigate impact to these piles and terraces

through directional tree felling and the restriction of heavy equipment. The EA expressly considers archeological issues, and concludes that the timber sale will not have any adverse impact on cultural resources. The plaintiff admitted at oral argument that the Forest Service has corrected some archeological errors he had pointed out by marking additional rock piles for protection. I conclude that the Forest Service has not acted arbitrarily or capriciously with regard to archeological resources. The defendants' motion for summary judgment as to Count 4 of the complaint is granted.

### F. Erroneous Analysis of Climactic Considerations (Count 5)

The plaintiff asserts that climactic considerations were erroneously analyzed in violation of NEPA: (1) the DN/FONSI erroneously concluded that katabatic winds created by the action will not have a significant impact on plaintiff's property; (2) appeals officer Joslin did not accept plaintiff's climactic arguments for the sole reason that it was outside the scope of the project; this ignores NEPA's requirement that the Forest Service consider cumulative effects.

■ *Wind impact.* In public comments to the scoping notice for the timber sale, the plaintiff raised the issue of "katabatic, or cold down slope winds" that were characteristic of "Great Northern" winds. A.R. Tab 41. The plaintiff also raised this issue in comments to the EA, referring to "tree damage from wind and ice on my land [that] comes dramatically out of the North." The plaintiff complained that the "tree harvest up slope will accelerate wind velocity[.]" A.R. Tab 83. In response to these concerns, the Forest Service evaluated the timber sale's impact on his cabin. The forest management officer found that the distance between plaintiff's property and the northern cutting unit (Unit 3) would create no adverse wind effect on the plaintiff's property. In his appeal to this court, the plaintiff now asserts that the Forest Service should have considered the wind effect from the harvest of Unit 2.[3] A review of the map

---

**3.** In support of his katabatic winds argument, the plaintiff submitted the report of an expert meteo-

rologist to this Court. This report is not a part of the administrative record in this case. As I have

of the project indicates that Unit 2 is directly east of plaintiff's property; the Forest Service states that Unit 2 is south and east of plaintiff's cabin. I do not find that the Forest Service acted arbitrarily and capriciously in interpreting plaintiff's complaints about "Great Northern" and "down slope" winds to mean a concern about cutting that is north of plaintiff's property. If the plaintiff was concerned about winds from the east, he should have raised the issue before the agency.

■ *Scope of project.* Appeal officer Joslin's response to the plaintiff's complaint about winds may not be a model of clarity. However, I find that the Forest Service did investigate the plaintiff's concern about winds and did communicate its response to the plaintiff. *See* A.R. Tab 79 at Appendix E. I do not find that Joslin acted arbitrarily and capriciously in handling the plaintiff's appeal on this point.

The defendants' motion for summary judgment as to Count 5 of the complaint is granted.

## G. ERRONEOUS ANALYSIS OF HYDROLOGICAL CONSIDERATIONS (COUNT 6)

The plaintiff argues that the Forest Service erroneously analyzed hydrological issues: (1) the EA failed to estimate the number of tons of sediment which will occur during and after the cutting; (2) the Forest Service has conceded it has not used any scientifically substantiated method of sediment prediction; (3) the slope in unit two, plaintiff's only source of water, is especially vulnerable to losing top soil; (4) the DN/FONSI only provides a 50-foot buffer zone and will not eliminate the hazard of pollution of plaintiff's water; (5) the EA erroneously stated existing roads would suffice for the timber harvest, yet the timber sale prospectus provides for one mile of roads to be built. I will address these allegations in turn.

### 1. Sediment analysis

■ The Forest Service conducted a soil and water analysis for a number of proposed timber sales, including the Rucker Lap sale.

*See* A.R. Tab 22. This analysis concluded that the Rucker Lap sale would not result in a significant impact on soil and water quality. *See id; see also* A.R. Tab 79 at 13. The Forest Service calculated a tolerable soil loss factor, or "T factor," for the sale and found that erosion was well below the level that can occur without lowering soil productivity. The EA contains an extensive analysis of the effects of the timber sale on water quality and sedimentation and points out the numerous measures the Forest Service is taking to address sedimentation and riparian concerns. *See id.* at 10–16.

■ Contrary to plaintiff's assertion, 36 C.F.R. § 219.5(a–b) does not mandate that the Forest Service have a scientifically substantiated method of sediment prediction. As appeal officer Joslin points out, "There is no mention in the NFMA or its implementing regulations that the [Forest Service] must use scientifically substantiated method(s) of sediment prediction [or that] failing to do so violates [Forest Service] policy for habitat management." A.R. Tab 102. Moreover, the plaintiff has failed to point to a regulation that requires the Forest Service to make an estimate of the number of tons of sediment that will occur during and after the proposed cutting. I find that the Forest Service's analysis of hydrological factors and its use of the T factor in sediment analysis were not arbitrary and capricious.

### 2. Hazards of pollution to plaintiff's water source

■ As mentioned above, the Forest Service has extensively analyzed soil and water issues for the timber sale. Stream protection standards for the timber sale are consistent with the LRMP, the Appalachian Mountain Vegetation Management FEIS, and Virginia Best Management Practices for forestry activities. *See* A.R. Tab 101 at 11. The plaintiff points to no statutory requirement that the Forest Service individually address each well and spring in the area. Moreover, appeal officer Joslin has noted that the Forest Service will consult with the plaintiff to ensure that refueling or transfer

previously ruled, I will not accept this report as

evidence in this action.

of materials within the immediate vicinity of plaintiff's property will be at "safe and secure locations." *See id.* at 12. I do not find that the plaintiff has stated a claim sufficient to overturn the EA or DN/FONSI. If, during the logging process, the plaintiff develops a takings claim for degradation to his water, he can raise it then.

### 3. Roads

The plaintiff misread the EA to state that no roads would be built. The EA discloses that no *new* roads that would remain open would be built, but 1.0 miles of *temporary* roads would be built. *See* A.R. Tab 79 at 9.

The defendants' motion for summary judgment as to Count 6 of the complaint is granted.

### H. ERRONEOUS ANALYSIS OF REGENERATION/ACCESSIBILITY CONSIDERATIONS (COUNT 7)

■ The plaintiff alleges the Forest Service erroneously analyzed regeneration/accessibility considerations in that the DN/FONSI fails to consider the ecological value of spacing regeneration units next to adjoining property. Specifically, the plaintiff claims that the defendants failed to consider his request to place a 300–foot corridor between his land and the timber harvest.

■ The LRMP requirement that even-aged regeneration methods be separated from each other by a minimum distance of 330 feet is complied with. *See* A.R. Tab 79 at App. E. Contrary to the plaintiff's assertion, there is no requirement that 330 feet separate regeneration units from adjacent private property. Such a requirement would undermine the Forest Service's mandate to effectively manage the GWNF. Moreover, as noted above, the Forest Service has worked to mitigate the visual impact of the unit two cut on plaintiff's property by leaving a strip of trees along the boundary, feathering the edge of the trees, and leaving a higher than normal basal area. *See* A.R. Tab 103.

I find that the Forest Service has not acted arbitrarily and capriciously in addressing regeneration/accessibility considerations. The defendants' motion for summary judgment on Count 7 of the complaint is granted.

### I. ERRONEOUS ANALYSIS OF ECOLOGICAL CONSIDERATIONS (COUNT 8)

The plaintiff claims the Forest Service erroneously analyzed ecological considerations: (1) the creation of grass and brush openings was offered as a justification for Alternative 2; yet, the Forest Service did not consider that unfenced grassy areas already exist on plaintiff's land; (2) there is no evidence that an adequate biological evaluation ("BE") or EA was conducted to identify threatened, endangered or sensitive plant and animal species ("TES species"); (3) the Forest Service has insufficient data on the viability of sensitive species; (4) the DN/FONSI claims harvesting will be suspended if threatened or endangered species are noted, but there is no evidence individuals trained to identify such species will be present during harvesting; (5) the DN/FONSI concedes a number of birds will suffer reduced habitat, but fails to substantiate its finding of no significant impact or to describe adequate mitigation methods; (6) the DN/FONSI contains no analysis of the impact of the harvest on nesting migratory birds; logging of trees during the April 1 to September 15 bird nesting period will illegally destroy bird nests; (7) the Forest service selectively emphasizes data on deer and turkey populations, even though many areas already exist which provide habitat for deer; (8) opening the forest canopy will hinder tree diversity, allowing undesirable tree species to proliferate and predominate.

### 1. Wildlife considerations

■ The Forest Service has conducted an thorough analysis of wildlife issues. The EIS for the LRMP notes that an extensive analysis of the habitat for management indicator species ("MIS species")[4] was undertak-

4. MIS species are chosen by the Forest Service as "monitoring proxies for a number of other plant and animal species." *Krichbaum v. Kelley,* 844 F.Supp. 1107, 1114 (W.D.Va.1994).

Changes in the population of MIS species are believed to indicate the effects of management activities on other species or biological communities. *See* A.R. Tab 3 at 3–169.

en for the GWNF. *See* A.R. Tab 3 at 3–169 *et seq.* Certain neotropical migratory songbirds are included as MIS species in order to address concerns about the effect of Forest Service actions on these birds. *See* A.R. Tab 79 at 23. A site specific wildlife analysis was also done in preparation for the proposed timber sale. The EA contains an extensive discussion of the results of this analysis and concludes that the minimum viable population of the MIS species would be maintained. *See* A.R. Tab 79 at 23–33.

The Forest Service conducted a BE of TES species for the timber sale. *See* A.R. Tab 59. As part of the BE, a field survey of the project area to search for TES species and their potential habitat was conducted on February 27 and June 6, 1995. *See id.* at 1. The Forest Service consulted with a number of other state and federal agencies to obtain their input on wildlife habitat. *See* A.R. Tabs 34, 40, 46, 48, and 82. The BE concluded that no federal or state-listed or proposed TES plant or animal species would be affected, because no occurrence of these species was found in the project area. *See* A.R. Tab 59 at 3–4. The EA echoes the conclusion of the BE that no TES species will be affected.

 The plaintiff's complaint about the effect of the timber sale on migratory birds has been raised for the first time on this appeal. From my review of the record, the only complaints listed above that the plaintiff raised before the Forest Service during its administrative review of the timber sale are his concerns about grass and brush openings, the adequacy of the BE, and the reduction of bird habitat. *See* A.R. Tabs 41, 83. The plaintiff first raised concerns about the presence of individuals during harvesting, sufficiency of data on the viability of sensitive species, and benefits to deer in his administrative appeal. *See* A.R. Tab 90. As I pointed out at oral argument on this motion, I am not a forester. It is wholly inappropriate for me to address the Forest Service's handling of an issue that was not previously raised by the plaintiff. Moreover, my review of the record indicates that, contrary to the plaintiff's assertion, the Forest Service did consider the effects of the timber sale on several MIS species of migratory birds. *See* A.R. Tab 79 at 23.

Several of the complaints (e.g., considering grassy areas on plaintiff's land, obtain more data on TES species, provide an individual to identify TES species during harvesting) concern things the plaintiff claims the Forest Service should have done or should do that go beyond the scope of what the Forest Service is required to do. The plaintiff points to no evidence that the Forest Service has not done something that it was legally required to do. To the contrary, the Forest Service has abundant evidence that its process for the analysis of wildlife complied with federal regulations. This court is not an appropriate venue to expand the requirements for Forest Service actions.

The plaintiff makes general challenges to the adequacy of the BE and the data on species. However, the plaintiff does not provide specific scientific information as to how the BE and species data are inadequate or in derogation of the law.

Contrary to the plaintiff's assertion about the effects of the timber sale on bird habitat, I find that the Forest Service has adequately investigated the question of bird habitat and provides ample evidence in support of its conclusion that the minimum viable populations of MIS species birds will be met.

I do not find that the Forest Service has arbitrarily and capriciously favored deer and turkey habitat. As the EA notes, deer, turkey, bear and several bird species are the only MIS mammals in the timber sale area. *See* A.R. 79 at 25. The EA addresses the habitat of each MIS species in detail. The plaintiff appears to jump from the mere fact that deer and turkey populations would increase as a result of the timber sale to a conclusion that the Forest Service is somehow biased in favor of deer and turkey populations. This completely ignores the fact that the Forest Service has concluded that bear, flicker, and brown-headed cowbird habitat would also increase.

I find that the Forest Service has not acted arbitrarily and capriciously in its evaluation of wildlife in preparation for the timber sale.

## 2. Tree diversity

 It is apparent from the EA that tree diversity was considered by the Forest Service. *See* A.R. Tab 79 at 18–23. For example, the EA notes that oak trees will be regenerated by retaining "significant numbers of oaks in the stands." *Id.* at 22. A silviculturist was involved· in the planning of the timber sale. *See* A.R. Tab 102 at 14. The fact that the plaintiff and the Forest Service have different opinions about how to achieve tree diversity does not support a conclusion that the Forest Service has acted arbitrarily and capriciously in selecting its method of meeting NFMA's requirement for tree diversity, *see* 16 U.S.C. § 1604(g)(3)(B), within the objectives of the LRMP. I find that the Forest Service has not acted arbitrarily and capriciously in considering tree diversity.

The defendants' motion for summary judgment as to Count 8 of the complaint is granted.

## J. FAILURE TO GIVE GOOD FAITH CONSIDERATION TO THE NO ACTION ALTERNATIVE (COUNT 9)

The plaintiff claims that the Forest Service failed to give good faith consideration to the no action alternative. The plaintiff maintains that, in the past five years, there has been a systematic tenfold increase in the rate for denial of appeals of timber sales and the no action alternative has not been selected once in the Pedlar Ranger District.

 In my analysis of Count 1, I addressed the Forest Service's adequate consideration of the no action alternative in this case. As noted *supra*, the Forest Service often does not publicly select a no action alternative: it merely drops the proposal. An allusion to denials of appeals in other timber sales is not sufficient to demonstrate that the Forest Service is acting arbitrarily and capriciously with regard to this timber sale. I will grant the defendants' motion for summary judgment as to Count 9 of the complaint.

## III. MOTION FOR PRELIMINARY INJUNCTION

 In ruling on plaintiff's request for a preliminary injunction, the court must determine whether:

a. there is a "substantial likelihood" the plaintiff will succeed on the merits;

b. there is a "substantial threat of irreparable injury if the injunction were not granted";

c. "the threatened injury to the plaintiff outweighs the harm an injunction may cause the defendant[s]"; and

d. the public interest would be served by granting the preliminary injunction.

*Church v. City of Huntsville,* 30 F.3d 1332, 1342 (11th Cir.1994); *see also Granny Goose Foods, Inc. v. Bhd. of Teamsters and Auto Truck Drivers Local No. 70 of Alameda County,* 415 U.S. 423, 441, 94 S.Ct. 1113, 1125, 39 L.Ed.2d 435 (1974). Because a preliminary injunction is an extraordinary remedy, the moving party bears the burden of proof on each of the prerequisites. *See Church,* 30 F.3d at 1342 (holding that, because plaintiffs failed to establish a substantial likelihood of prevailing on the merits, a preliminary injunction was not proper and there was no need to discuss remaining three prongs).

As I have granted the defendants' motion for summary judgment, the plaintiff fails to meet the first prong of the *Church* test. Under *Church,* I need not consider the other criteria. Accordingly, the plaintiff's motion for preliminary injunction is denied.

## IV. CONCLUSION

For the foregoing reasons, the defendants' motion for summary judgment is granted and the plaintiff's motion for preliminary injunction is denied. An appropriate order shall issue.