Steven **KRICHBAUM**, Plaintiff,

v.

**U.S. FOREST SERVICE, and Steve Parsons, Defendants.**

No. CIV. A. 97–0027–H.

United States District Court,
W.D. Virginia,
Harrisonburg Division.

Aug. 27, 1998.

Steven Krichbaum, Staunton, VA, pro se.

Alonzo H. Long, U.S. Attorney's Office, Roanoke, for United States Forest Service, Steve Parsons, District Ranger, defendants.

### MEMORANDUM OPINION

MICHAEL, Senior District Judge.

This matter comes before the court on the parties' cross-motions for summary judgment. Plaintiff Steven Krichbaum seeks judicial review of the decision of the defendant Forest Service and the defendant District Ranger Steve Parsons to conduct the Alba Salvage Timber Sale ("Alba Sale") in an area of the George Washington National Forest ("Forest") in Augusta County, Virginia.

Krichbaum alleges that the defendants approved the Alba Sale without following the procedural requirements of the National Environmental Policy Act ("NEPA") and in violation of the Forest's Final Revised Land and Resource Management Plan ("Revised Plan"). The parties have briefed and argued the issue in relation to their cross-motions for summary judgment. On April 10, 1998, the Magistrate Judge issued his findings and recommended disposition of the case pursuant to 28 U.S.C. § 636(b)(1)(B). In determining whether to adopt the Magistrate

Judge's report and recommendation, this court reviews the case *de novo*.[1]

## I.

The court first turns to the factual and procedural background of the case.[2] Mr. Krichbaum seeks judicial review, under the Administrative Procedures Act ("APA"), 5 U.S.C. §§ 701 *et seq.*, of an administrative decision by the defendants, the United States Forest Service ("Forest Service") and Steve Parsons, District Ranger, who approved the Alba Sale. Krichbaum alleges that the defendants' decision to permit the salvage sale in the George Washington National Forest: (1) violated Forest Service regulations promulgated under the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*; and (2) conflicts with the Forest's Final Revised Land and Resource Management Plan ("Revised Plan"), which was prepared under the guidelines set forth in the National Forest Management Act ("NFMA"), 16 U.S.C. § 1600 *et seq.*

More specifically, Krichbaum alleges that the defendants:

a. improperly applied a categorical exclusion ("CE") allowing them to avoid doing an Environmental Assessment ("EA") of the salvage site area where timber harvests remove 1 million board feet or less of timber for salvage purposes, or 250,000 board feet for non-salvage sales, because the Alba Sale would remove too much undamaged timber;

b. improperly applied a CE by ignoring the presence of a municipal watershed in violation of the Forest Service's regulations under NEPA;

c. approved the Alba Sale in violation of the Revised Plan because the proposed salvage sale will not meet the visual quality objective ("VQO") under the Revised Plan;

d. approved the Alba Sale in violation of the Revised Plan by proposing a salvage sale that is in reality an "even-aged" timber cut, rather than an uneven-aged one;

e. failed to survey adequately the area for threatened, endangered, and sensitive ("TES") animal and plant species;

f. failed to classify properly the salvage area as being suitable for timber production; and

g. failed to assess adequately whether the proposed sale would significantly affect riparian areas.

*See* Complaint at ¶¶ 15–27.

In 1995 the Alba Sale area was defoliated by gypsy moths. Pursuant to the Revised Plan, the defendants assessed the area to see how best to prevent tree mortality and suppress the gypsy moth population. In July 1996, a Forest Service silviculturist surveyed the area where this occurred, known as Stand 4,[3] and found that: fifty percent (50%) of the white oak were dead and most of the remaining white oak were damaged; most of the scarlet oak had heart rot and were overmature, with ten percent to fifteen percent (10%—15%) of those trees dead and many more expected to die within two years; ten percent (10%) of the chestnut oak were dead; and the white pines in the area were unaffected. Administrative Record ("AR") Tabs 23, 24, and 26.

---

1. *Orpiano v. Johnson*, 687 F.2d 44, 48 (4th Cir. 1982).

2. On September 30, 1997, the defendants submitted a "Statement of Material Facts." Plaintiff agrees there is no genuine dispute as to all but ten of the 156 enumerated paragraphs in Defendants' Statement. Even as to the ten paragraphs with which plaintiff disagrees, plaintiff concedes that these facts can be cited in the record.

3. For administrative purposes, the Forest is divided into 18 management areas ("MA's"), which are further divided into compartments (1,000–1,500 acres each) and stands (10–40 acres each). The Alba Sale is to occur in MA 13, Compartment 451, Stand 4. AR Tab 23. MA 13 is designated as a Dispersed Recreation Area in the Revised Plan. However, the Revised Plan also provides that vegetation manipulation (including salvage of dying trees) may occur in MA 13 if needed for rehabilitation or to meet the desired future condition in the area. While most of the lands in MA 13 are classified as unsuitable for timber production, the area of the Salvage Project comprises 20 acres of land suitable for timber production. AR Tabs 1, 24, 37.

On August 5, 1996, the District Ranger proposed a salvage sale for the twenty (20) acres most affected by the defoliation. AR Tab 24. A notice of the proposed sale was sent to various State agencies, organizations, and persons (including Mr. Krichbaum). AR Tab 25. On August 9, 1996, a Forest Service landscape architect also inspected Stand 4, and determined that a careful harvest of trees would improve the scenic beauty of the damaged area and would meet the Forest's long-term visual quality goals. On September 3, 1996, public comments regarding the proposed sale were solicited, including those from plaintiff. AR Tabs 31, 32, 33.

On September 24, 1996, a Forest Service zone hydrologist determined that, although the proposed sale is located in the North River watershed, it would not have a significant impact on the water quality, water yield, soil productivity, other uses of the North River or other area streams or lakes. The hydrologist also found that the Alba Sale area was outside the flood plains, wetlands, and other riparian areas, and that the soils and "slope class" for the area were similar to areas where two earlier timber sales had had no significant effects on water quality, yield, or soil productivity. AR Tabs 35, 21.

A biological evaluation performed on October 4, 1996 concluded with a finding of no occurrence of threatened, endangered, or sensitive ("TES") species in the project area. In preparing the evaluation, a wildlife biologist reviewed lists of TES species known to occur in the Forest and their preferred habitats; consulted data on TES species maintained by the Virginia Division of Natural Heritage ("VDNH"); and conducted his own field survey. The biologist recommended that if certain guidelines were applied to the Alba Sale, there would be no effect on any Federally listed species nor on the future viability of any TES species. AR Tab 36.

Under statutory and regulatory procedures, the Forest Service normally must conduct an Environmental Assessment ("EA") to determine whether a proposed project will have significant environmental effects. If, after conducting an EA, the Forest Service makes a "finding of no significant impact" ("FONSI"), then a more detailed Environmental Impact Statement ("EIS") is not necessary. 40 C.F.R. § 1501.4(e). Under NEPA, if the Forest Service determines based on the EA that the action would have a significant environmental impact, the Forest Service must complete an environmental impact statement ("EIS") to determine further the environmental impact of the action. 42 U.S.C. § 4223(2)(C).

NEPA, however, also allows agencies to adopt "categorical exclusions" ("CE")[4] that exempt projects from the EA and EIS requirements. If a proposed action fits within a CE, neither an EIS nor EA is needed. 40 C.F.R. § 1508.4. If an "extraordinary circumstance" exists,[5] then a proposed project cannot be placed in a CE and an EA is required. See Forestry Service Handbook ("FSH") 1909.15, § 30.3.

Under Forest Service regulations, FSH 1909.15, §§ 31.1(b) or 31.2, a project qualifies for a CE if it involves: (1) timber harvests removing not more than 250,000 board feet of merchantable wood; or (2) salvage logging removing not more than 1,000,000 board feet of merchantable wood. Under this second, 1,000,000 board feet exception, the Forest Service concluded that the Salvage Project constituted a CE, and so did not perform an EA or an EIS. All parties agree that the Alba Sale will remove only 200,000 board feet of merchantable wood products. The Forest Service contends, therefore, that the Project qualifies under both the 250,000 board feet exemption for non-salvage sales and the 1,000,000 exemption for salvage sales.

4. A CE is defined as: "a category of actions which do not individually or cumulatively have a significant effect on the human environment and which have been found to have no such effect in procedures adopted for a Federal agency ... and for which, therefore, neither an [EA] or [EIS] is required." 40 C.F.R. § 1508.4.

5. Extraordinary circumstances are "[c]onditions associated with a normally excluded action that are identified during scoping [initial assessment of the area] as potentially having effects which may significantly affect the environment." *Forestry Service Handbook* 1909. 15, § 30.5.

On October 17, 1996, the District Ranger decided to implement the Alba Sale. The District Ranger determined that the Sale would result in several benefits: (1) rehabilitation of the scenic landscape so the long-term visual quality objective ("VQO") of retention would be met;[6] (2) moving the area toward an uneven-aged condition; (3) minimizing future damage from gypsy moths; (4) utilization of a resource prior to deterioration. The "no action" alternative was considered by the District Ranger and found not to provide these benefits. AR Tab 37. A copy of his Decision Memorandum was mailed to the plaintiff and a notice of the decision was published in the local newspaper. AR Tabs 39, 40. Mr. Krichbaum took an administrative appeal from the District Ranger's decision. AR Tab 41. On January 11, 1997, the Regional Forester, acting on behalf of the Forest Service, affirmed the District Ranger's decision after carefully considering *and* responding to plaintiff's comments. *See* AR Tab 44. The Forest Service awarded the timber harvesting contract, which requires that the guidelines, and recommendations of the biologist be applied. The Forest Service silviculturist again surveyed the site in May 1997 to monitor compliance and found that an estimated ninety-four and nine-tenths percent (94.9%) of the sale volume would come from dead or damaged trees.[7] AR Tabs 47, 48.

Mr. Krichbaum filed his Complaint on April 30, 1997, requesting judicial review of the administrative decision. On December 31, 1997, the defendants filed a "Notice of Intent" with the court stating that logging operations in the Alba Sale project area would commence on or about January 5, 1998. On January 22, 1998, this court denied Mr. Krichbaum's request for injunctive relief to block the logging.

6. In addition to the long-term VQO for each management area in the forest, the Revised Plan provides for application of two short-term VQOs—rehabilitation and enhancement—when necessary and appropriate to meet a long-term VQO. AR Tab 1, 3.

7. The Revised Plan provides that salvage sales can include an incidental amount of healthy trees. AR Tab 1, p. 3–73.

## II.

Plaintiff's challenge to the Forest Service's decision under the APA, NEPA, and NFMA can succeed only if the decision is shown to be "arbitrary and capricious," 5 U.S.C. §§ 706(2)(A) and 706(2)(C),[8] or erroneous under the agency's own regulations. Numerous courts have had occasion to apply this narrow standard to cases brought under these particular statutes. *See, e.g., Sierra Club v. Robertson,* 784 F.Supp. 593, 604 (W.D.Ark.1991), *aff'd,* 28 F.3d 753 (8th Cir. 1994) (agency finding of no environmental impact of a project under NEPA is reviewed under arbitrary and capricious standard and "there is no doubt" that same standard applies to review under NFMA). The Supreme Court in *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 109 S.Ct. 1851, 104 L.Ed.2d 377, (1989) interpreted the arbitrary and capricious standard as applied to claims under NEPA to "require that agencies take a 'hard look' at the environmental effects of their planned action." *Marsh,* 490 U.S. at 374, 109 S.Ct. 1851. However, "where the legal issue is the meaning of the Forest Service's own regulations, the agency's interpretation is controlling where it is not plainly erroneous or inconsistent with the regulation." *Sierra Club v. Robertson,* 784 F.Supp. at 604, citing *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 359, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989). Furthermore, an agency's actions are presumed to be correct and the court will give deference to the agency's "expertise and judgment." *Sierra Club v. Robertson,* 810 F.Supp. at 1021 (citations omitted). The court must defer to agency expertise particularly "when questions of scientific methodology are involved." *Inland Empire Public Lands Council v. United States Forest Service,* 88 F.3d 754, 760 (9th Cir.1996). Even when plaintiff or others express disagree-

8. The United States Supreme Court has stated that the "arbitrary and capricious" standard is akin to the "reasonableness" standard applicable to certain other types of district court rulings. *See Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 377 n. 23, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989).

ment with the opinions of agency specialists, "an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if. . . a court might find contrary views more persuasive." *Marsh*, 490 U.S. 360 at 377, 109 S.Ct. 1851.

The Fourth Circuit has recognized this standard of review, as has this court. *See, e.g., Roanoke River Basin Ass'n v. Hudson*, 940 F.2d 58, 61 (4th Cir.1991), *cert. denied*, 502 U.S. 1092, 112 S.Ct. 1164, 117 L.Ed.2d 411 (1992); *Virginia Agric. Growers Ass'n v. Donovan*, 774 F.2d 89, 92–93 (4th Cir.1985); *Krichbaum v. Kelley*, 844 F.Supp. 1107, 1110 (W.D.Va.1994), *aff'd*, 61 F.3d 900, 1995 WL 449668 (4th Cir.1995). The Fourth Circuit has specifically described the "arbitrary and capricious" standard of review as applied in deciding summary judgment motions as a "narrow one." *Virginia Agric. Growers*, 774 F.2d at 93. (citations omitted).

▮ Here, as in any other case challenging the actions of an administrative agency, it is important to remember that the question before the court is whether the decision of the administrative agency is in fact "arbitrary and capricious" or erroneous under the agency's regulations, rather than whether the plaintiff disagrees with certain of the factual statements contained in the administrative record. "The court is not empowered to substitute its judgment for that of the agency." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). Rather, the court examines the agency's decision-making process to ensure that it was "based on a consideration of the relevant factors" an there was no "clear error of judgment." *Id.*

Summary judgment is appropriate if no genuine dispute of material fact exists and the moving parties are entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c) and *Anderson v. Liberty Lobby*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In considering a motion for summary judgment, the court should draw all facts and inferences in favor of the non-moving party.

*See id.* at 248, 106 S.Ct. 2505; *Charbonnages de France v. Smith*, 597 F.2d 406 (4th Cir. 1979). A party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact. . . ." Fed.R.Civ.P. 56(c).

▮ Ordinarily in considering a motion for summary judgment, the non-moving party is entitled to have the credibility of all its evidence presumed. *See Miller v. Leathers*, 913 F.2d 1085, 1087 (4th Cir.1990), *cert. denied*, 498 U.S. 1109, 111 S.Ct. 1018, 112 L.Ed.2d 1100 (1991). However, as this court has noted before, "the summary judgment motion stands in a somewhat unusual light," where, as here, "the administrative record provides the complete factual predicate for the court's review." *Krichbaum v. Kelley*, 844 F.Supp. at 1110.[9] Under these circumstances, "plaintiff's burden on summary judgment is not materially different from his ultimate burden on the merits," because the factual record in the case is closed. *Id.*

▮ There must be more than a "scintilla" of evidence to support the non-movant's case. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. Rather, the evidence must be sufficient to "return a verdict" at trial for the party opposing the entry of judgment. *Id.* The non-moving party "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir.1985). Moreover, the existence only of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion. *See Thompson Everett, Inc. v. National Cable Adv.*, 57 F.3d 1317, 1323 (4th Cir.1995) ("[I]f the evidence is 'merely colorable' or 'not significantly probative,' it may not be adequate to oppose entry of summary judgment.").

### III.

#### A. NEPA Violations

Plaintiff complains that defendants violated NEPA by using a Categorical Exclusion

---

**9.** As in *Krichbaum v. Kelley,* the court reviewed the administrative record in this case and found no need for augmentation to that record. In addition, on February 24, 1998, the Magistrate Judge granted defendants' motion, unopposed by plaintiff, to limit review to the administrative record.

("CE") to obviate preparation of an Environmental Assessment ("EA") for the Alba Sale. This count of the complaint consists of two main arguments: (1) that the presence of an extraordinary circumstance makes use of a CE improper; (2) that the Alba Sale does not fit into the sales volume category subject to a CE. Each of these arguments relies on interpretations of the Forest Service's own regulations and shall be discussed in turn.

The regulations implementing NEPA include the following definition of "categorical exclusion:"

> a category of actions which do not individually or cumulatively have a significant effect on the human environment and which have been found to have no such effect in procedures adopted by a Federal agency in implementation of these regulations (§ 1507.3) and for which, therefore, neither an environmental assessment nor an environmental impact statement is required. An agency may decide in its procedures or otherwise, to prepare environmental assessments for the reasons stated in § 1508.9 even though it is not required to do so. Any procedures under this section shall provide for extraordinary circumstances in which a normally excluded action may have a significant environmental effect.

40 C.F.R. § 1508.4.

Plaintiff's first argument concerns the direction of the latter part of this regulation, the Forest Service's provisions concerning extraordinary circumstances which prevent an action from being categorically excluded. Extraordinary circumstances are defined in FSH 1909.15 § 30.5 as "conditions associated with a normally excluded action that are identified during scoping as potentially having effects which may significantly affect the environment." The FSH provides an illustrative list of possible extraordinary circumstances that includes "c. Flood plains, wetlands, or municipal watersheds." FSH 1909.15 § 30.3–2. Further guidance in the FSH directs that an EA be prepared "if scoping indicates that extraordinary circumstances are present and it is uncertain that the proposed action may have a significant

effect on the environment." FSH 1909.15 § 30.3–3.

Plaintiff interprets these regulations to mean that mere presence of one of the listed extraordinary circumstances—here, a municipal watershed—automatically prohibits application of a CE to the Alba Sale. The Forest Service's own interpretation requires more than presence alone of an extraordinary circumstance to prevent use of a CE. The Forest Service does not present this interpretation for the first time in relation to this action. Rather, the same interpretation is set forth in a March 5, 1993 document prepared by the U.S. Department of Agriculture Regional Planning and Budget Director regarding "Clarification of Extraordinary Circumstances—Congressionally Designated Areas (Mount Rogers National Recreation Area)." AR Tab 20. That document explains that an action otherwise qualifying for a CE cannot be categorically excluded when an extraordinary circumstance is both present and "related to the proposed action," FSH 1909.15 § 30.3–1.b., meaning the action would have some negative impact on the "qualities, characteristics, and values which make the [Area] a unique place." AR Tab 20.

█ Here, the Forest Service recognized the presence of the Staunton municipal watershed in the area of the Alba Sale, but relied on the findings of its specialists that the sale would have no impact on the watershed. Under arbitrary and capricious review, the agency's reliance on its own reasonable interpretations of its own regulations and reliance on its own specialists are entitled to deference on review. This was not the first time that a Forest Service finding of no extraordinary circumstances *that would significantly affect the environment* allowed it to evade preparation of an EA for a project, notwithstanding the presence of one of the listed examples of an extraordinary circumstance. *See, e.g., Mahler v. United States Forest Service,* 927 F.Supp. 1559, 1571 (S.D.Ind.1996) (presence of steep slopes, highly erosive soils, floodplains, and migratory songbirds did not prevent application of CE where Decision Memo found that these circumstances would not cause the proposed

action to have significant effects on the environment); *Foundation for Global Sustainability Inc. v. McConnell,* 829 F.Supp. 147, 152 (W.D.N.C.1993) (in order to show that a salvage sale is not subject to CE, plaintiffs must show extraordinary circumstances that are not present in every salvage operation of similar size and type; each circumstance asserted by plaintiffs was found not to have effects significant enough to make Forest Service's decision arbitrary and capricious); *Citizens for the Scenic Severn River v. Skinner,* 802 F.Supp. 1325 (D.Md.1991) *aff'd.* 972 F.2d 338, 1992 WL 180138 (4th Cir.1992) (studies conducted showing that there would be no significant impact made it appropriate to grant CE even though potentially extraordinary circumstance was present). *See also, Southwest Center for Biological Diversity v. U .S. Forest Service,* 100 F.3d 1443, 1450 (9th Cir.1996) (CE allowed even where threatened and endangered species present if determination that project will not have negative effect). *But see Bensman v. U.S. Forest Service,* 984 F.Supp. 1242 (W.D.Mo. 1997) (presence of endangered species, Indiana bat, that lives in dead and dying trees, made Forest Service's decision to allow salvage sale without performing EA arbitrary and capricious when Forest Service did not gather research on presence of the bat in the salvage area); *Washington Trails Ass'n v. U.S. Forest Service,* 935 F.Supp. 1117, 1121 (W.D.Wash.1996) (fact that project would take place in "inventoried roadless area" was extraordinary circumstance related to proposed action).

■ The Forest Service's finding that the presence of a municipal watershed in the area of the Alba Sale was not a circumstance that would cause the salvage sale to have any significant impact on the environment was not so hastily reached as in *Bensman* that it can be deemed arbitrary and capricious. A hydrologist determined that the proposed sale would have "no significant effect on Elkhorn Lake or Staunton Dam or on the water quality or quantity of the water supply for the city of Staunton." AR Tab 35. He reached this conclusion by comparing the proposed sale to previously conducted sales that were larger in volume yet had no significant effect on water quality, soil productivity,

or water yields. *See id.* In addition, the biological evaluation found that there had been no significant effects on water and soil quality in similar projects. *See* AR Tab 36. The court agrees with the Regional Forester's analysis on administrative appeal that these comparisons with previous similar sales were a valid and reasonable method of measuring the impact of the proposed Alba Sale. *See* AR Tab 44.

■ Plaintiff's first argument that application of the CE was improper due to the possibly extraordinary circumstance of a municipal watershed being present must fail. The Forest Service's decision easily passes muster under the arbitrary and capricious standard of review. First, the Forest Service's usual interpretation of its own regulations concerning availability of a CE when a potentially extraordinary circumstance is present is not unreasonable and was not altered to allow this project to be approved without an EA. The Forest Service's construction comports with Congress's intent that in circumstances where an action would clearly have no significant impact on the environment, additional paperwork and procedures should be avoided. Second, the Forest Service's reliance on specialists, including a hydrologist and a biologist, was not unreasonable, even if plaintiff disagrees with the methodology used by these experts. For these reasons, the Forest Service's decision to allow a CE even though the Alba Sale area included a municipal watershed must be affirmed.

■ Plaintiff's second argument concerns the first part of 40 C.F.R. § 1508.4, which directs an agency to create categories of actions that have been found to have no significant effect on the environment and therefore do not require an EA. The Forest Service promulgated a list of categories of activity subject to CE at FSH 1909.15 § 31.1b and 31.2. The particular category on the list that pertains to the Alba Sale appears at FSH 1909.15 § 31.2–4, exempting timber harvests which remove 250,000 board feet or less of merchantable wood products and salvage sales involving 1,000,000 board feet or less of merchantable wood products.

The exempted harvests must also require one mile or less of road construction and assure regeneration of harvested or salvaged areas, where required. FSH 1909.15 § 31.2–4. The Forest Service terms the Alba Sale a salvage sale because its purpose is to remove damaged trees and protect other trees susceptible to gypsy moths. *See* AR Tab 34. Plaintiff contends that this is not a salvage sale because it will involve removal of living trees and species not susceptible to gypsy moth damage.

Even if the court were to accept plaintiff's argument that this project does not constitute a salvage sale, plaintiff's own brief in support of its motion for summary judgment concedes that this sale involves less than the categorically excluded amount for a timber harvest, not just less than the amount for a salvage sale. All parties agree that the Alba Sale will harvest only 200,000 board feet, well below the 250,000 maximum for a timber sale to be subject to a CE.

Furthermore, the Alba Sale clearly has all the defining features of a salvage sale under applicable regulations. Salvage sales, as defined by Forest Service Regulations, may include "additional green volume (including incidental amounts)" in order to provide for stand improvement. *See* AR Tab 34 (FSM 2435 "Salvage Sales"). A survey of the site after it had been prepared for harvesting found that only 5.1% of the sales volume would come from live trees. AR Tabs 47, 48. Courts have approved decisions to harvest damaged trees that would also entail removal of green trees "as necessary to gain access to the damaged timber." *McConnell*, 829 F.Supp. at 149. The Decision Memo of the District Ranger states that "healthy stems of non-preferred [by the gypsy moth] species (maple, gum, white pine, etc.) will be left in place." AR Tab. 37. The Alba Sale will not require construction of more than one mile of road. Therefore, the Forest Service's categorization of the Alba Sale as a salvage sale is not unreasonable. Whether considered as a salvage sale or timber harvest, the sales volume of the Alba Sale is well below the maximum sales volume to qualify for the categorical exclusion described at FSH 1909.15 § 31.2–4.

**B. Violations of the Revised Plan and NFMA**

NFMA, 16 U.S.C. § 1604, requires that the Forest Service prepare a comprehensive plan for each area under its management. The plan that governs the George Washington National Forest, which includes the Alba Sale area, is the Final Revised Land and Resource Management Plan ("Revised Plan"). Typically, documentation for proposed sales like the Alba Sale is "tiered" to the relevant plan, meaning the plan's directives and environmental impact statement are incorporated by reference. *See* 40 C.F.R. § 1508.29. The Alba Sale decision followed this pattern, making reference to the environmental impact statement and other parts of the Revised Plan.

Plaintiff claims that the Alba Sale violates at least five different aspects of the Revised Plan, and therefore violates NFMA as well. Specifically, Plaintiff's claims focus on (1) the Revised Plan's Visual Quality Objective ("VQO") for the Alba Sale area; (2) the use of what Plaintiff considers even-age management techniques; (3) the adequacy of data collection concerning threatened, endangered and sensitive ("TES") species in the area; (4) the lack of a site-specific finding of the area's suitability for timber harvesting; and (5) failure to take into account effects on riparian areas. In Plaintiff's Supplemental Memorandum to his Motion for Summary Judgment, he adds a sixth argument: that the defendants failed to adequately consider a no-action alternative for achieving the objectives stated for the Alba Sale. Although this argument does not appear explicitly in the Complaint, it underlies plaintiff's other arguments concerning violation of the Revised Plan and was explicitly argued on administrative appeal. Therefore, the court will construe liberally plaintiff's complaint and address in turn the adequacy of the Forest Service's consideration of the no-action alternative.

First, Plaintiff points to the Revised Plan's adoption of a visual quality objective ("VQO") of retention for the Alba Sale area and asserts that logging contradicts this VQO. In his Decision Memo, the District Ranger explains that although the area does have a

*long-term* VQO of retention, a short-term VQO of rehabilitation has been adopted due to damage to the trees caused by gypsy moths. *See* AR Tab 37, p. 6. The Forest Service's view is that gypsy moth damage prevents achievement of the long-term VQO of retention and the best way to mitigate that damage and move more quickly toward the retention VQO is the proposed salvage sale. "Removing the dead stems and allowing new growth to regenerate will ensure that the retention VQO is met faster than would otherwise occur..." *Id.*

In adopting the short-term VQO of rehabilitation, the Forest Service again relied on the findings of its specialists. The landscape architect who surveyed the site recommended adoption of a short-term VQO of rehabilitation. *See* AR Tab 37. The landscape architect's memorandum also advises application of standards from the Revised Plan in conducting the salvage sale so that the long-term retention VQO will be met more quickly. *See id.*

Plaintiff misunderstands the Forest Service's use of the term "retention" as a VQO. He argues that because logging activity itself will be obvious to visitors to the area and degrade its beauty, the decision to allow the Alba Sale automatically violates the VQO. However, the VQO logically pertains not to management activities as they are occurring but to their perceived effects after they have been completed. Plaintiff's position is so extreme that it would prevent uniformed rangers from ever being present in forest areas with a retention VQO because they would be noticed by visitors.

■ The Forest Service's adoption of a short-term VQO that will move the Alba Sale area toward the long-term VQO of retention is not so unreasonable that it makes the decision to approve the sale arbitrary and capricious. Damage to the area occurred due to the gypsy moth, not due to management activities. The Revised Plan allows vegetation manipulation to mitigate such damage. The Alba Sale was reasonably cal-

culated to achieve such mitigation and move the area toward its long-term VQO more quickly.

Plaintiff's second asserted violation of the Revised Plan is the use of what he deems to be even-aged management rather than uneven-aged management as the Forest Service claims. The relevant regulations define even-aged management as

> The application of a combination of actions that results in the creation of stands in which trees of essentially the same age grow together... The difference in age between trees forming the main canopy level of a stand usually does not exceed 20 percent of the age of the stand at harvest rotation age... Clearcut, shelterwood, or seed tree cutting methods [10] produce even-aged stands.

36 C.F.R. § 219.3. Uneven-aged management, on the other hand, entails actions which

> ... simultaneously maintain continuous high-forest cover, recurring regeneration of desirable species, and the orderly growth and development of trees through a range of diameter or age classes to provide a sustained yield of forest products. Cutting is usually regulated by specifying the number or proportion of trees of particular sizes to retain within each area, thereby maintaining a planned distribution of size classes. Cutting methods that develop and maintain uneven-aged stands are single-tree selection and group selection.

*Id.*

Plaintiff claims that by removing oaks from the Alba Sale area, the project will result in an 80 percent reduction in the main canopy level of the stand, effectively removing a majority of the canopy. The Forest Service's description in its Scoping notice divides the canopy into an overstory, dominated by white, scarlet and chestnut oak and white pine; an intermediate canopy dominated by white pine; and an understory, also dominated by white pine. *See* AR Tab. 24.

---

**10.** Clearcutting involves cutting down all the trees in an area. Seed tree cutting leaves only a few trees to naturally seed the cut area. Shelterwood cutting leaves double the number of trees standing that would be left by seed tree cutting. *See Sierra Club v. Espy,* 38 F.3d 792, 795 (5th Cir.1994).

As proposed, the Alba Sale would not harvest gum, maple, pine or any other species not preferred by gypsy moths. *See* AR Tab 23. The Forest Service's silviculturist monitored the area after trees had been marked for harvest and found that only one healthy non-preferred tree had been marked due to its proximity to the existing road to be used in conducting the harvest. *See* AR Tab 48. He also stated unequivocally that the trees remaining after harvesting would provide a "residual overstory and midstory," and "leave the stand in a multi-storied and uneven-aged condition." *Id.*

■ The Forest Service's interpretation and application of the regulations' definition of even-aged versus uneven-aged management in this case are not so unreasonable as to render its decision arbitrary and capricious. Again, the Forest Service is entitled to rely on the technical knowledge of its own experts, namely the silviculturist who monitored the site. In addition, it is more reasonable to consider this sale an uneven-aged management activity because it will leave a large number of white pine trees of advanced age which form an overstory of the canopy along with younger trees in the midstory and understory. The descriptions of the Alba Sale in the record are much more in keeping with the ideas of group selection found in the definition of uneven-aged management than the ideas of clearcutting, shelterwood, or seed tree cutting found in the definition of even-aged management.

The Forest Service argues in the alternative that even if the Alba Sale could be considered even-aged management it would still be allowed under the Revised Plan. The Fourth Circuit has approved the use of even-aged techniques under NFMA in the George Washington National Forest, not only in exceptional circumstances, but whenever the Forest Service has made the choice with due regard for its effects on the "protection of soil, watershed, fish, wildlife, recreation, and esthetic resources." *See Fener v. Hunt,* 971 F.Supp. 1025, 1033 (W.D.Va.1997) (Kiser, J.) *aff'd.* 151 F.3d 1028, 1998 WL 390162, (4th Cir.1998) (siding with the Fifth Circuit view on appropriate use of even-aged methods in

*Sierra Club v. Espy,* 38 F.3d 792, 798–800 (1994) rather than the Sixth Circuit view in *Sierra Club v. Thomas,* 105 F.3d 248, 250 (1997)). The *Thomas* decision, which announced the Sixth Circuit view espoused by plaintiff that even-aged methods should be used *only* in exceptional circumstances, was vacated by the Supreme Court's decision in *Ohio Forestry Ass'n Inc. v. Sierra Club,* — U.S. —, 118 S.Ct. 1665, 140 L.Ed.2d 921 (1998). By statute, even-aged management may be employed where "it is determined to be appropriate, to meet the objectives and requirements of the relevant land management plan." 16 U.S.C. § 1604(g)(3)(F)(i).

■ The Forest Service gave due regard to the proposal's effects on wildlife, the watershed, and the appearance of the forest, as discussed previously. Therefore, even if the Alba Sale is categorized as even-aged management, the decision to approve it was not so unreasonable that the court must overturn it on review under the arbitrary and capricious standard. The Forest Service's view that the Alba Sale employs uneven-aged techniques reasonably relies on logical interpretations of regulatory definitions and the expert opinions of specialists. Furthermore, the Forest Service's consideration of the effects of the Alba Sale on the environment makes its decision reasonable even if it does entail even-aged methods.

Plaintiff next asserts that the Alba Sale violates the Revised Plan because the Forest Service failed to perform an adequate inventory of TES species in the area of the Sale. Plaintiff faults the biological evaluation as inadequate because it was based on a one-day visit and makes conclusions without enough data. Finally, plaintiff states that the site of the Alba Sale does include habitats for two species of hawk.

The wildlife biologist who conducted the biological evaluation took several steps before concluding that no TES species or their habitats were present in the area of the Alba Sale. The biologist consulted the Virginia Division of Natural Heritage ("VDNH"), which had no documentation showing natural

heritage resources in the project area.[11] *See* AR Tab 29. He also consulted other Forest Service experts. The biologist identified potentially affected TES species by reviewing the list of TES plant and animal species known or likely to occur in the Forest and their habitat preferences.[12] In addition to his own on-site survey of the area, the biologist reviewed element occurrence records. *See* AR Tab 36. His results showed that the project area hosted only commonly occurring plants and animals, no TES plants or animals or their habitats, and therefore very low potential for any negative effects from the Alba Sale. *See id.*

Although plaintiff deems this biological evaluation inadequate, courts have repeatedly approved as reasonable TES data inventories using the same basic methodology as was used here. For example, in *Fener*, Judge Kiser rejected plaintiff's argument that the Forest Service erroneously analyzed ecological considerations where a biological evaluation included a field survey, consultation with state and federal agencies, and a conclusion that no TES plant or animal species would be affected because there was no occurrence of these species in the project area. *See Fener*, 971 F.Supp. at 1036–1037. This court rejected a similar argument made by Krichbaum in a previous case. *See Krichbaum v. Kelley*, 844 F.Supp. at 1112–1113 In that case, as here, the biological evaluation found no TES species or adverse impacts after a one-day field survey and consultation with VDNH database and other Forest Service experts. This court repeats its holding in that case here because the methods used in preparing the biological evaluation are identical in the two cases:

> To be sure, the absence from the Natural Heritage database of data for this project site does not necessarily indicate that no sensitive species reside there [cite omitted], but in conjunction with the other sources consulted, the court finds that the agency was neither arbitrary nor capricious to take the results of the database

search at face value.... It may be that a more extended on-site investigation would have provided greater certainty on the question of the existence of sensitive species in the project area. It does not follow, however, that the agency's less costly evaluation was infirm in light of the statute or the NEPA regulations.

*Id. See also, Sierra Club v. Glickman*, 974 F.Supp. 905, 938 (E.D.Texas 1997) (Forest Service has discretion to use site-specific method, but inventories of selected representative species at intervals are adequate); *Krichbaum v. Joslin*, 973 F.Supp. 585, 591–592 (W.D.Va.1997) *aff'd.* 139 F.3d 890 (4th Cir.1998) (rejecting challenge to adequacy of Forest Service data collection because of Forest Service's broad discretion to decide what data is necessary for a particular management decision); *Sierra Club v. Martin*, 992 F.Supp. 1448, 1461 (N.D.Ga.1998) (Forest Service only required by regulation to have data "appropriate" for decision to sell tract of timber, not to have any particular type or quantum of data); *Inland Empire Public Lands Council*, 88 F.3d. at 760–762 (level of analysis of species population data urged by plaintiff goes beyond what is required; Forest Service's own reasonable methodologies—including estimates and assumptions—are entitled to deference); *Sierra Club v. Robertson*, 810 F.Supp. at 1029 (Forest Service has discretion to determine what constitutes best information in inventorying; plaintiffs' disagreement with method of inventory not enough to state a claim).

■ In sum, plaintiff's criticisms of the methodology used by Forest Service experts to analyze the effects of the Alba Sale on TES species do not reveal inadequacies that merit reversal of an agency's decision under the arbitrary and capricious standard of review.

In his fourth allegation of a violation of the Revised Plan, plaintiff asserts that the specific site of the Alba Sale was never determined to be suitable for timber. The Forest Ser-

---

**11.** Natural heritage resources are "the habitat of rare, threatened, or endangered plant and animal species, unique or exemplary natural communities, and significant geologic formations." AR Tab 29.

**12.** The two species of hawk mentioned by plaintiff were considered by the biologist.

vice answers that the Revised Plan provides that vegetation manipulation (including salvage of dying trees) may occur in MA 13 if needed for rehabilitation or to meet the desired future condition in the area. While most of the lands in MA 13 are classified as unsuitable for timber production, the area of the Alba Sale comprises 20 acres of land suitable for timber production. AR Tabs 1, 24, 37. In addition, criteria for suitability in general were previously set forth in the Revised Plan and then applied specifically to the Alba Sale site via a site specific analysis by a silviculturist.

By statute, the Forest Service is required to identify lands unsuitable for timber production, "considering physical, economic, and other pertinent factors to the extent feasible." 16 U.S.C. § 1604(k). However, the requirement that no timber harvesting occur on such designated unsuitable areas allows an exception for "salvage sales or sales necessitated to protect other multiple-use values." *Id.* Furthermore, none of the relevant statutes or regulations requires that the Forest Service make site-by-site analyses of the suitability of each stand within each management area for timber cutting. *See Sierra Club v. Robertson,* 28 F.3d 753, 760 (8th Cir.1994). *See also, Sierra Club v. Robertson,* 784 F.Supp. at 607 (appropriateness of cutting stand of trees should be determined in light of larger compartment that contains the stand rather than applying statutory and regulatory requirements on a site-by-site basis). As explained in the decision on Krichbaum's administrative appeal of the Decision Memo, no site-specific analyses are necessary in preparing a Decision Memo, unlike preparing an EA. *See* Tab 44.

■ Plaintiff's argument here must fail because in many ways it resembles his argument that the Alba Sale involves even-aged management rather than uneven-aged management. Standards for MA 13, which includes the Alba Sale area, provide that dead trees may be salvaged and live or damaged trees may be cut for scenic rehabilitation even on lands unsuitable for timber production. *See* AR Tab 38. On lands suitable for timber production within MA 13, uneven-aged management using group selection is

appropriate. These standards, combined with the expert opinions of the landscape architect and other Forest Service specialists, demonstrate that the Alba Sale complies with the Revised Plan. Under the statute, the land need not be found suitable for timber harvesting in order for salvage sales to go forward. Under the Revised Plan, the entire MA—of which the Alba Sale site is but a tiny portion—had already been deemed suitable for uneven-aged management. Because the court finds that the Forest Service is reasonable in considering the Alba Sale to have the characteristics of a salvage sale and uneven-aged management, plaintiff's claim that the area was never determined to be suitable for timber harvesting cannot succeed under the arbitrary and capricious standard.

■ Plaintiff's fifth claimed violation of the Revised Plan revisits his earlier argument that the Forest Service did not adequately weigh the effects of the Alba Sale on riparian areas. For the reasons stated above, the Forest Service was reasonable in relying on the hydrologist's finding of no significant effects on water quality, soil productivity, and water yield. Therefore, the Forest Service's decision was not arbitrary and capricious with regard to its consideration of effects on riparian areas. *See, e.g., Krichbaum v. Kelley,* 844 F.Supp. at 1117–1118.

■ Finally, at various points throughout his claims, plaintiff asserts that the Forest Service did not adequately consider the "no-action" alternative for its effectiveness in providing the same benefits expected from the Alba Sale. The Decision Memo sets forth the Forest Service's reasoning with regard to the no-action alternative and its inferiority to the Alba Sale. The Forest Service's discretion in evaluating alternatives leads this court, like others before it, to the conclusion that the Forest Service adequately considered alternatives in making its decision. *See, e.g., Krichbaum v. Joslin,* 973 F.Supp. at 593–594. Plaintiff claims that the Forest Service exhibits bias in favor of logging activities whenever it makes decisions to allow sales like the Alba Sale. For support of this point, plaintiff cites the *Thomas* case, which, as stated above, was vacated upon review by

the Supreme Court in *Ohio Forestry Ass'n,* —— U.S. at ——, ——, 118 S.Ct. at 1668, 1672 (holding that plaintiff's challenge to a plan for permitting too much logging in general was not a justiciable claim and should be dismissed).

## IV.

Thus, none of plaintiff's allegations that the Alba Sale is not in keeping with NEPA or the Revised Plan can succeed on review under the arbitrary and capricious standard. The Forest Service followed the procedures it has followed in the past in analyzing the effects of a proposed action, relying on trained experts, and acceptable methodologies. The court therefore concludes that the Forest Service's decision to conduct the Alba Sale was reasonable under NEPA, NFMA, and the relevant regulations and not arbitrary and capricious within the meaning of that standard in the APA. Defendant's Motion for Summary Judgment shall be granted and Plaintiff's Motion for Summary Judgment shall be denied.

An appropriate Order shall issue this day.