**SHENANDOAH ECOSYSTEMS DEFENSE GROUP, et al., Plaintiffs,**

v.

**UNITED STATES FOREST SERVICE, et al., Defendants.**

**No. CIV.A. 5:00CV00009.**

United States District Court, W.D. Virginia, Harrisonburg Division.

March 14, 2001.

Theodore Jack Korth, Carmel Nelson & Dugger, PLC, Charlottesville, VA, for plaintiffs.

John F. Corcoran, U.S. Attorney's Office, Roanoke, VA, for defendants.

## MEMORANDUM OPINION

WILSON, Chief Judge.

Plaintiffs Shenandoah Ecosystems Defense Group, Wade A. Neely, Earl Cash, Jimmy Williams, and Rock Haven Lodge, Inc., (collectively, the "plaintiffs") bring this action under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*, seeking judicial review of actions undertaken by defendants United States Forest Service, Forest Supervisor William E. Damon, Jr., and District Ranger David Rhodes (collectively, the "Forest Service") with respect to the proposed Chestnut Ridge # 2 Timber Sale within the George Washington and Jefferson National Forests. The plaintiffs allege that the Forest Service violated the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, the National Forest Management Act ("NFMA"), 16 U.S.C. § 1600 *et seq.*, and those statutes' applicable regulations because (1) the administrative record is not sufficient to justify the Forest Service's Finding of No Significant Impact ("FONSI"), and (2) the Forest Service did not complete an Environmental Impact Statement ("EIS") prior to authorizing the Chestnut Ridge # 2 Timber Sale. This court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337, 1361, and 5 U.S.C. § 701 *et seq.* This matter is before the court on cross motions for summary judgment. Finding that it lacks jurisdiction over it, the court dismisses the plaintiffs' claim under the Endangered Species Act. Upon an independent review of the administrative record, the court concludes that the Forest Service is entitled to summary judgment on all remaining claims because its decision was not arbitrary or capricious,

not an abuse of discretion, and not shown to be in violation of law.

## I.

The material facts of this case are not in dispute. Defendant United States Forest Service is the agency of the United States Government, Department of Agriculture, that administers the National Forest System within the laws established by Congress.[1] The United States Forest Service maintains offices at the national, regional, forest, and district levels. Accordingly, the United States Forest Service manages the George Washington and Jefferson National Forests for various uses, such as recreation, wilderness, and timber.

At issue in this action is the proposed Chestnut Ridge # 2 Timber Sale ("timber sale"). The location of the timber sale is in the southern portion of the Deerfield Ranger District, George Washington National Forest, in Bath County, Virginia. (Administrative Record ("AR") Tab 170.) As detailed in the Final Revised Land and Resource Management Plan for the George Washington National Forest ("Forest Plan"), the purpose and need for the project is to achieve management direction for a portion of Management Area–15 ("MA–15"). (AR Tab 133 at 1.) The Desired Future Condition ("DFC") of MA–15 is to have breeding, nesting, and a fall and winter wildlife habitat in a balanced age class mosaic of hardwood and pine vegetation to provide, among other things, a continuous supply of hard and soft mass. (*Id.* at 1.) To accomplish that DFC, the timber sale project would involve harvesting timber, constructing roads, wildlife openings, and wildlife habitat, prescribing

burning, and other silvicultural or wildlife habitat work on the eastside of Chestnut Ridge. (AR Tab 120 at 1–2.)

Plaintiffs Wade A. Neely, Earl Cash, and Jimmy Williams are landowners who live along Virginia State Route 629 in Bath County, which is adjacent to the proposed timber sale area. They regularly use their property and the property on which the timber sale is to occur for hunting and other recreation. In addition, plaintiff Neely maintains ponds on his property that are fed by waters flowing from the area of the timber sale. Plaintiff Rock Haven Lodge, Inc., also owns land along Virginia State Route 629, and its members regularly use its property and the property on which the timber sale is to occur for hunting and other recreation. Finally, plaintiff Shenandoah Ecosystems Defense Group contains members who regularly read about, visit, recreate on, and work to protect the ecosystems of the land of the George Washington National Forest in and around the area of the Chestnut Ridge # 2 site. In addition, its members include owners of property adjacent to or located downslope of the proposed timber sale area.

The administrative history of the timber sale project dates back over four years. On May 30, 1996, the Deerfield Ranger District, George Washington National Forest, issued a scoping notice to the public for comments on the proposed timber sale. (AR Tab 38.) Next, on January 17, 1997, the Environmental Assessment ("EA") was submitted to the public for comments for thirty days. (AR Tab 68.) Finally, on November 12, 1997, David Rhodes, District Ranger for the Deerfield Ranger District,[2]

---

1. Defendant William E. Damon, Jr., is the Forest Supervisor for the George Washington National Forest, and he is responsible for supervising the management and day-to-day operations of that forest. Defendant David

Rhodes is the forest ranger in charge of the administration of the Deerfield Ranger District, George Washington National Forest.

2. The District Ranger is the highest ranking officer in a District Office. He or she is

issued a Decision Notice and FONSI for the timber sale. (AR Tab 79.)

In response, five appeals were filed with the Appeal Deciding Officer, Regional Forester Elizabeth Estill, (AR Tabs 100–103, 114), but one was dismissed for lack of timeliness, (AR Tab 120). The remaining four appellants included current plaintiffs Shenandoah Ecosystems Defense Group, Neely, and Williams. On March 13, 1998, the Appeal Deciding Officer reversed the District Ranger's decision on the timber sale, concluding that, in making his decision, the District Ranger had not adequately responded to issues and questions that the public had raised regarding water quality. (AR Tab 129.)

Accordingly, the District Ranger conducted additional analyses and, on August 20, 1998, sent a Revised EA to the public for comment. (AR Tab 133.) Then, on February 1, 1999, the District Ranger issued a second Decision Notice and FONSI for the timber sale. (AR Tab 170.) Those documents contained the rationale for the decision and the environmental effects of the proposed action. In addition, those documents appropriately were tiered to the 1993 Final EIS prepared for the Forest Plan. (AR Tab 3.) All of the plaintiffs filed a timely notice of appeal to the FONSI pursuant to the administrative appeal procedures for the national forest system. *See* 36 C.F.R. § 215 *et seq.*

The District Ranger's Decision Notice selected Alternative 2 from the Revised EA. (AR Tab 170 at 1.) That alternative harvests approximately eighty-six acres of timber in seven stands by the modified shelterwood cutting method and also thins seventy-three acres in two stands. It also constructs 1.5 miles of system road and twenty-nine acres of permanent wildlife openings. Other wildlife treatments include releasing grapevines and mass-producing crop trees on 107 acres along with prescribed burning on twenty-five acres. After harvesting, eighty-six acres in five stands will be site prepared for a natural regeneration using chainsaws and hand tools.

Elevations in the project area range from about 1750 feet to 3280 feet. (AR Tab 133 at Maps.) The timber sale is drained by small intermittent and perennial streams that flow off the northwest slopes of Chestnut Ridge and into Stuart Run. The Forest Service maintains that the soils on the timber sale fully are capable of supporting the planned timber harvest activities, with the applicable Forest Plan Standards and Guidelines and Virginia Best Management Practices being implemented as part of the project. (*Id.* at 32.) In contrast, the plaintiffs assert that it is impossible to state that the soils in the timber sale's area are capable of supporting the cut.

The age class distribution of the various tree species on the timber sale is predominantly in the 51–100+ year age classes. (*Id.* at 26.) Currently, about six percent of the project area is in the 0–20 year age class and seven percent of it is in the 21–30 year age class.

The project area is to be managed to meet adopted visual quality objectives of partial retention. (*Id.* at 35.) Virginia State Route 629 runs along the western side of the project area. The proposed thinning within stand 748/38 lies within the foreground zone of that route. All other stands lie in middle ground as viewed from Virginia State Route 629 or the unseen slopes of Chestnut Ridge.

responsible for the District's day-to-day operations and signs decisions authorizing actions within the District.

In response to the District Ranger's Decision Notice issued on February 1, 1999, selecting Alternative 2 from the Revised EA, a total of nine notices of appeal were filed with the Appeal Deciding Officer, including those filed by the plaintiffs. (AR Tabs 175–183.) Three of those nine appeals were dismissed for various reasons. On May 18, 1999, in separate decisions, the Appeal Deciding Officer affirmed the District Ranger on all issues. (AR Tabs 196–201.) After the Appeal Deciding Officer issued those decisions, the timber sale was scheduled for offering. Bids for the sale were scheduled for opening in the Deerfield Ranger District Office on February 8, 2000. However, due to this litigation, the Forest Service canceled the bid opening on February 4, 2000.

## II.

Summary judgement is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R.Civ.P. 56(c). When the court reviews an administrative agency's decision, the summary judgment motion "stands in a somewhat unusual light, in that the administrative record provides the complete factual predicate for the court's review." *Krichbaum v. Kelley*, 844 F.Supp. 1107, 1110, (W.D.Va.1994). Because the factual record is closed, the "plaintiff's burden on summary judgment is not materially different from his ultimate burden on the merits." *Id.* Thus, to survive summary judgment, "the plaintiff must point to facts in the administrative record—or to factual failings in that record—which can support his claims under the governing legal standard." *Id.*

■ Here, the APA governs judicial review of the Forest Service's decision. *See* 5 U.S.C. § 706. To survive summary judgment under the APA, the plaintiffs must point to facts or factual failings in the administrative record that indicate that the Forest Service's decision is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2)(A); *see also Krichbaum v. United States Forest Service*, 973 F.Supp. 585, 590 (W.D.Va.1997). If the plaintiffs cannot do so, then the Forest Service's decision stands.

The plaintiffs claim that the Forest Service violated the NFMA, NEPA, and those statutes' applicable regulations. As stated, the court must use the "arbitrary and capricious" standard to review the Forest Service's decision. However, that standard "is not altered by the more substantive statutes which underlie the APA claim." *Kelley*, 844 F.Supp. at 1110. In short, judicial review ensures that an agency has taken a "hard look" at the environmental effects of its decision. *See Robertson v. Methow Valley Citizens*, 490 U.S. 332, 350, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989); *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n. 21, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976). Thus, the court ultimately must determine whether the agency has based its decision on a consideration of the relevant factors, has articulated a rational connection between the facts found and the decision made, and has not made a clear error of judgment. *See Baltimore Gas & Elec. Co. v. Natural Resources Defense Council, Inc.*, 462 U.S. 87, 105, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983); *Virginia Agric. Growers Ass'n, Inc. v. Donovan*, 774 F.2d 89, 93 (4th Cir.1985).

With those principles in mind, the court will address each of the plaintiffs' claims. Although the court will address each claim separately for clarity, the court's treatment of each claim should not be taken in isolation, as that treatment often has application to other, similar claims.

## III.

■ The plaintiffs maintain that the Forest Service violated NEPA, 42 U.S.C. § 4321 *et seq.,* and its applicable regulations. Under NEPA, a federal agency must prepare an EIS for a major federal action "significantly affecting the quality of the human environment." 42 U.S.C. § 4331(2)(C). In order to determine whether an EIS must be prepared, the agency first may prepare an EA. 40 C.F.R. §§ 1501.3, 1508.9.[3] If the agency decides that an EIS is not required because the proposed action will have no significant impact, then the agency reports that decision formally in a FONSI. *Id.* § 1508.13. Here, the District Ranger issued a FONSI along with a Decision Notice approving the timber sale on February 1, 1999. The plaintiffs contest that decision, maintaining that the Forest Service's decision that a full-fledged EIS is not necessary because the proposed action will have no significant impact is arbitrary and capricious.

The plaintiffs also maintain that the Forest Service violated the NFMA, 16 U.S.C. § 1600 *et seq.,* and its applicable regulations. The NFMA governs the Forest Service's regulation of the National Forest System. The NFMA requires the Forest Service to prepare a land and resource management plan ("LRMP") for each unit of the National Forest system. *See* 16 U.S.C. § 1604(a). An LRMP governs the use of an individual forest, and, in essence, it is "a programmatic statement of intent that establishes basic guidelines and sets forth the planning elements that will be employed by the Forest Service in future site-specific decisions." *Sierra Club v. Robertson,* 28 F.3d 753, 755 (8th Cir. 1994). In addition, the NFMA directed the Forest Service to adopt implementing regulations, *see* 16 U.S.C. § 1604(g)(3), which are found at 36 C.F.R. § 219.1 *et seq.* Finally, the court notes that NEPA regulations also apply to the NFMA. *See* 16 U.S.C. § 1604(g)(1).

The plaintiffs first contest the sufficiency of the Revised EA upon which the Forest Service based its issuance of the FONSI. Specifically, the plaintiffs maintain that the Revised EA does not include or constitute a reasoned evaluation of the environmental issues or a hard look at the environmental consequences of the proposed timber sale. Consequently, the plaintiffs argue, the Forest Service acted arbitrarily and capriciously by issuing the FONSI instead of requiring an EIS and by approving the timber sale without preparing an EIS.

### A.

In support of that argument, the plaintiffs maintain that the Forest Service failed to address properly the potential cumulative impacts of the timber sale. NEPA requires federal agencies to consider the cumulative impacts on the environment of related proposed federal actions. Cumulative impacts are those that occur as a result of a cumulation of discrete impacts in the past and in the foreseeable future. *See* 40 C.F.R. § 1508.7. As the Supreme Court has explained, "when several proposals for ... related actions that will have cumulative or synergistic environmental impact upon a region are pending concurrently before an agency, their environmental consequences must be considered together." *Kleppe v. Sierra Club,* 427 U.S. 390, 410, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976). However, the scope

---

**3.** An EA has been described as a "rough-cut, low-budget environmental impact statement designed to show whether a full-fledged environmental impact statement ... is necessary." *Cronin v. United States Dep't of Agric.,* 919 F.2d 439, 443 (7th Cir.1990); *see also* 40 C.F.R. § 1508.9 (defining an EA).

and extent of the duty to discuss cumulative impacts "requires the weighing of a number of relevant factors, including the extent of the interrelationship among proposed actions and practical considerations of feasibility." *Id.* at 412, 96 S.Ct. 2718. Moreover, for any proposed action, the Forest Service must determine the appropriate spatial and temporal bounds for each effect and resource area.

Based on its review of the administrative record, the court concludes that the Forest Service properly considered the cumulative impacts of the timber sale. The Forest Service has taken a hard look at the timber sale's cumulative impacts within the appropriate bounds of the analysis area and examined the potential environmental effects for each of the alternatives of the proposed action. Accordingly, the court cannot conclude that the Forest Service acted arbitrarily and capriciously by issuing the FONSI instead of requiring an EIS and by approving the timber sale without preparing an EIS.

The plaintiffs argue that the Forest Service has not analyzed properly the cumulative effects of the timber sale on the environment and wildlife. The plaintiffs contend that a review of the Revised EA discloses references to cumulative effects on the environment and wildlife, but that the Forest Service presents no insight as to what information it used, how that information is applicable, or why stated outcomes are correct. In essence, the plaintiffs criticize the Forest Service's analysis of cumulative effects as being conclusory and self-serving. In short, they do not accuse the Forest Service of not considering the cumulative effects on the environment and wildlife, but rather of not doing it well. However, the court notes that an EA is supposed to be "a concise public document." 40 C.F.R. § 1508.9(a). Further, it is supposed to "[b]riefly provide

sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact." *Id.* at 1508.9(a). An EA cannot be both concise and brief and provide detailed analysis for every issue and comment. It follows that, with respect to the cumulative effects of the timber sale on the environment and wildlife, the court finds the Revised EA sufficient to prevent the FONSI from being arbitrary and capricious.

Even so, the Forest Service's consideration of the timber sale's cumulative effects on the environment and wildlife is pervasive at all levels of the analysis in the administrative record. Accordingly, the court concludes that the Forest Service adequately addressed the timber sale's cumulative effects on the environment and wildlife within a rational spatial and temporal scope. First, with respect to the cumulative effects on the environment, the Revised EA properly focused the bounds of its cumulative effects analysis on the identified significant issues. In the process, the Forest Service examined the potential environmental effects for each of the alternatives for the proposed action, including direct, indirect, and cumulative effects. *See Shenandoah Ecosystems Defense Group v. United States Forest Service,* 24 F.Supp.2d 585, 590 (W.D.Va.1998). Moreover, the Forest Service divided its analysis of effects into ecological, social, and economic components. *See id.* The environmental analysis necessarily varied for each alternative evaluated in detail because each alternative proposed a different amount or method of timber harvest, and, accordingly, the degree of the impacts vary. Although the Forest Service *could* have discussed further cumulative effects on the environment, the Council on Environmental Quality ("CEQ") has stated that "[i]t is not practical to analyze the cumulative effects of an action on the universe;

the list of environmental effects must focus on those that are truly meaningful." (AR Tab 17 at 8.) The Revised EA did just that, and, thus, the Forest Service's analysis was not arbitrary and capricious. Consequently, the court concludes that the Forest Service has taken a hard look at the timber sale's cumulative effects on the environment and grants the Forest Service's motion for summary judgment on that claim.

Likewise, the court finds that the Forest Service has taken a hard look at the timber sale's cumulative effects on wildlife. The Revised EA reveals that the Forest Service analyzed the timber sale's cumulative effects on interior forest dependent species, such as the black bear, (AR Tab 133 at 27–28), and neo-tropical migratory birds, (*Id.* at 28–29), and on threatened and endangered species, (AR Tabs 53, 133 at 19–26). Moreover, for the Indiana bat, the geographic scope of analysis was the entire George Washington National Forest. (AR Tab 133 at 19.) Therefore, because it cannot conclude that the Forest Service failed to consider the timber sale's cumulative effects on wildlife, the court grants the Forest Service's motion for summary judgment on that claim.

**B.**

The plaintiffs allege that the Forest Service also failed to analyze properly the timber sale's resource impacts. They maintain that the Forest Service did not analyze properly the timber sale's impacts to the project area's soil and water resources or the impacts of road construction from the timber sale. Accordingly, the plaintiffs argue, the Forest Service acted arbitrarily and capriciously by issuing the FONSI instead of requiring an EIS and by approving the timber sale without preparing an EIS.

The plaintiffs assert that the Forest Service acted arbitrarily and capriciously because it has not considered properly the timber sale's impacts on the project area's soil and water resources. However, the plaintiffs have not presented any information to the Forest Service or this court that the agency's conclusions are inaccurate. Also, the plaintiffs do not suggest that the Forest Service completely failed to consider the timber sale's cumulative effects on the project area's soil and water resources. Instead, the plaintiffs contest the use of the findings that resulted from the application of the Forest Service's methodology. In effect, the plaintiffs contend that the Forest Service acted arbitrarily and capriciously by relying on data derived from methods of analysis that have been questioned by the Department of Agriculture and that, according to the plaintiffs, have limited value. Despite the plaintiffs' best efforts to convince it otherwise, the court fails to recognize how the plaintiffs' claim is anything but a disagreement with the Forest Service's methodology, which is unavailing under an arbitrary and capricious standard of review.

When questions of scientific methodology are involved, courts are especially deferential to agency expertise. *See Inland Empire v. United States Forest Service,* 88 F.3d 754, 760 (9th Cir.1996); *Sierra Club v. Marita,* 46 F.3d 606, 619–624 (7th Cir. 1995). Here, to determine the effects of the project on the soil, the Forest Service used historical data to develop a tolerable soil loss factor, or "T-factor." Based on a survey of the soils within the project area, (AR Tabs 124, 126, 130, 161, 165), and historical information from forty-three similar projects, (AR Tab 32), the Forest Service accumulated information that it used to predict the effects of the project on soil and water, (AR Tab 133 at 13–14, 29–35). That method of analysis has been discussed and upheld in past challenges.

*See Fener v. Hunt,* 971 F.Supp. 1025, 1035 (W.D.Va.1997); *Krichbaum v. Kelley,* 844 F.Supp. 1107, 1117–18 (W.D.Va.1994). Nothing that the plaintiffs argue or that the administrative record contains or lacks leads the court to conclude that the Forest Service is not entitled to that same deference here.

Further, the Revised EA included specific mitigation measures designed to limit any adverse effects to the soil and water resources, including compliance with Virginia's Best Management Practices for Forestry.[4] (AR Tab 133 at 5–7, 29–35.) In addition, based on historical data, the Forest Service concluded that the timber sale will cause a slight increase in water yield. (AR Tab 32). However, the Forest Service concluded that the resulting yield will not increase significantly the beneficial uses of streams or flood levels.

After analyzing its data, the Forest Service concluded that the timber sale will not result in a significant impact on the project area's soil and water resources. As shown, the administrative record reveals that the Forest Service extensively analyzed the timber sale's impacts on the project area's soil and water resources. The Forest Service enjoys broad discretion to use its expertise in deciding what data is necessary for a particular decision. Likewise, the Forest Service is entitled to rely on its own methods of analysis and resulting data when making those decisions. Because the court cannot conclude that the Forest Service inadequately analyzed the timber sale's impacts on the project area's soil and water resources, the plaintiffs are not entitled to relief. Consequently, the court grants the Forest Service's motion for summary judgment on that claim.

The plaintiffs also contend that the Forest Service failed to satisfy Common Standard 216 of the Forest Plan. Accordingly, the plaintiffs argue, the Forest Service violated the Forest Plan's requirements and, thus, the NFMA. *See* 16 U.S.C. § 1604(i) (requiring that timber sales be consistent with forest plans). Common Standard 216 provides:

> Project plans and their environmental analyses which plan to conventionally harvest timber recognize and specifically analyze conditions and situations where soil productivity may be impaired long term. These conditions are listed as: soils less than 20 inches to bedrock, extremely stony surfaces, and conditions established by the soil inventory where K-value (soil erodibility factor) and continuous slope indicates the T–Factor (allowable soil loss) is exceeded.

(AR Tab 1 at 3–146.) Essentially, the plaintiffs accuse the Forest Service of using a procedure whereby it bypasses applicable laws and regulations until it is challenged on the subject, and that its alleged failure to comply with Common Standard 216 is an example of that procedure in practice. Contrary to the plaintiffs' contention, the administrative record reveals that the Forest Service adequately analyzed soils for potential long-term impairment. The Forest Service favorably concluded that, for the timber sale, it expected soil loss to fall below the T–Factor, with no loss in soil productivity. (AR Tab 133 at 33.) Likewise, the soil scientist recognized that "rocky soils" existed in stand 741/39 in the watershed above plaintiff Neely's ponds. (AR Tab 130.) Nonetheless, the soil scientist concluded that, with the specific mitigation measures, the impacts to

4. Because it ultimately concludes that the Forest Service adequately analyzed the timber sale's impacts on the project area's soil and water resources, the court summarily rejects the plaintiffs' contest of the Forest Service's assertion pertaining to those specific mitigation measures.

the ponds on plaintiff Neely's property will be minimal or nonexistent. (*Id.*) Therefore, the court concludes that the Forest Service undertook sufficient analysis to comply with its obligations under Common Standard 216 and, thus, grants the Forest Service's motion for summary judgment on that issue.

■ Next, the plaintiffs maintain that the Forest Service did not analyze properly the impacts of road construction from the timber sale. Contrary to the plaintiffs' assertion, the administrative record is replete with analysis on that subject. The Forest Service considered the timber sale's impacts on aesthetics, (AR Tab 133 at 35–36), and wildlife, (*Id.* at 26–29). The Forest Service also considered the impacts of road construction from the timber sale on adjacent landowners' ponds and water supply. (*Id.* at 29–31.) Finally, the plaintiffs allege that the Forest Service has assessed inadequately the effects of the timber sale in terms of its propensity to create edge effects. Edge effects "are detrimental ecosystem effects resulting from the discontinuity of forest cover caused by logging and logging access roads." *Krichbaum v. Kelley*, 844 F.Supp. 1107, 1116 (W.D.Va.1994). The edge effects result because excessive logging and road-building enable "edge" animals to penetrate the forest and prey on wildlife that inhabit the interior. Here, the court finds nothing arbitrary and capricious about the Forest Service's treatment of that issue. Although not specifically referred to as "edge effects," the agency analyzed the timber sale's effects on the habitats of various wildlife species and documented the impacts for the different alternatives in the Revised EA. (AR Tab 133 at 26–29.) Moreover, the Revised EA dis-

closed the effect of the edges created by the cuts for each alternative. (*Id.* at 26–29). Accordingly, the court grants the Forest Service's motion for summary judgment on that claim.

■ The plaintiffs raise two other issues involving road construction. First, the plaintiffs contend that the Forest Service failed to satisfy the Forest Plan's standards regarding road construction because they did not comply with the Forest Plan's road density requirements. Standard 15–5 of the Forest Plan provides direction for open road density:

> The Forest objective is to limit open interior road densities to no more than one mile of open road per 1,000 acres. In cases where open road density exceeds one mile of open interior road per 1,000 acres, Forest officers strive to reduce the open road densities to the desired standard. Road to area ratio are based on acreage of the individual management area.

(AR Tab 1 at 3–81.) The Revised EA identifies the current open road density for the project area as 0.7 miles per 1,000 acres, while at the same time recognizing that the existing open road density of MA–15 exceeds the Forest Plan's desired standard. (AR Tab 133 at 15.) Thus, according to the Forest Service, the open road density goals will be met for the project area. Further, the timber sale allows for construction of up to one and a half miles of new roads. (AR Tab 170 at 1.) However, because they will be closed year-round, those newly constructed roads will not contribute to the open road density of the area.[5] (AR Tab 1 at 3–158.) Therefore, according to the Forest Service, the timber sale will have no impact on the existing

---

5. Likewise, temporary roads are not used in calculating open road densities. (AR Tab 1 at 3–158.)

open road density of MA–15. Under those circumstances, the court cannot conclude that the Forest Service acted arbitrarily and capriciously and, consequently, grants the Forest Service's motion for summary judgment on that issue.

Second, the plaintiffs maintain that the Forest Service violated its duty under Standard 15-5 of the Forest Plan to "strive to reduce the open road densities to the desired standard" of one mile of open interior road per 1,000 acres. Accordingly, the plaintiffs argue, the Forest Service violated the Forest Plan's requirements and, thus, the NFMA. *See* 16 U.S.C. § 1604(i) (requiring that timber sales be consistent with forest plans). However, the Forest Plan does not specify a time period for achievement of its standards. Given that fact, the court cannot conclude that the Forest Service violated its duty under Standard 15–5 simply by approving a timber sale that itself will have no impact on the existing open road density of MA–15. Moreover, the administrative record shows that the Forest Service is aware that the existing open road density of MA–15 exceeds the Forest Plan's desired standard, and that the Forest Service has considered methods for reducing the open road density of MA–15. (AR Tab 29.) Consequently, the court concludes that the plaintiffs are not entitled to relief on that claim.

### IV.

■ The plaintiffs also contest the sufficiency of the Revised EA's biological data. The plaintiffs maintain that, although it utilizes a Biological Evaluation ("BE"), the Revised EA does not contain a Biological Assessment ("BA") prepared in accordance with the Endangered Species Act ("ESA"). *See* 16 U.S.C. § 1536(c)(1). The Forest Service disputes the court's jurisdiction over the plaintiffs' contest to the Revised

EA's biological data. Specifically, the Forest Service maintains that the plaintiffs actually are alleging that the Forest Service violated the ESA, and, therefore, that the plaintiffs must comply with the jurisdictional prerequisites to filing suit under the ESA. *See id.* § 1540(g)(2)(A) (requiring that a 60–day notice period be met before bringing suit to redress an alleged ESA violation). The plaintiffs do not deny that they failed to comply with the ESA's notice requirement, but rather maintain that it does not apply to·their claim. Instead, they assert that they are not alleging violations of the ESA, but rather are asserting that the BE does not meet the requirements of a BA and, therefore, is an inadequate substitute for a BA. (Compl.¶¶ 33–36.) Finding that assertion to be a distinction without a difference, the court concludes that the ESA's notice requirement applies to the plaintiffs' claim.

Pursuant to Forest Service Manual ("FSM") § 2672.41, when preparing a BE, the Forest Service envisions that it will be used as a tool to ensure compliance with both the ESA and the NFMA. (AR Tab 30.) To that end,·the Forest Service may rely upon the BE to determine how a proposed action will affect species identified by the Forest Service as sensitive under the NFMA. (*Id.* at FSM § 2672.42.) Likewise, the Forest Service also may rely upon the BE to comply with the ESA requirement that it prepare a biological assessment whenever the agency proposes or authorizes major construction activities that may impact a proposed or listed threatened or endangered species. *See* 16 U.S.C. § 1536(c)(1); 50 C.F.R. § 402.12(b)(1).

Here, the plaintiffs do not contest the Forest Service's reliance on the BE to ensure compliance with the NFMA. Instead, they maintain that the Revised EA does not contain a BA prepared in accor-

dance with the ESA, 16 U.S.C. § 1536(c). Specifically, the plaintiffs contest the sufficiency of the BE prepared by the Forest Service to serve as a substitute for a BA. By doing so, the plaintiffs necessarily are contesting the Forest Service's reliance on the BE to ensure compliance with the ESA requirement pertaining to biological assessments. The court cannot allow the plaintiffs to circumvent the ESA's notice requirement through semantics and, therefore, concludes that they actually are asserting a claim under the ESA. Accordingly, because the plaintiffs admittedly have not complied with the ESA's notice requirement, this court does not have jurisdiction to consider the plaintiffs' contest to the sufficiency of the Revised EA's biological data. *See Southwest Ctr. for Biological Diversity v. United States Bureau of Reclamation,* 143 F.3d 515, 520 (9th Cir.1998); *see also Hallstrom v. Tillamook,* 493 U.S. 20, 23 & n. 1, 26, 110 S.Ct. 304, 107 L.Ed.2d 237 (1989) (construing strictly a provision in the Resource Conservation and Recovery Act of 1976, which the Court noted is similar to 16 U.S.C. § 1540(g)(2)). Consequently, the court dismisses that claim.

## V.

■ Next, the plaintiffs maintain that the FONSI is arbitrary and capricious because the Forest Service failed to satisfy various NEPA requirements and CEQ regulations.[6] NEPA requires federal agencies to prepare an EIS detailing the environmental impacts of every "major Federal action[ ] significantly affecting the quality of the human environment." 42 U.S.C.A. § 4332(2)(C). Agencies typically prepare an EA to determine whether an EIS is warranted. *See* 40 C.F.R. § 1501.4(b). If the EA reveals that the

proposed action is one "significantly affecting" the environment, then the agency moves on to the EIS process. *See id.* § 1501.4(c). In contrast, if the agency concludes based on the EA that an EIS is not warranted, then it issues a FONSI. *See id.* § 1501.4(e). Here, the Forest Service prepared an EA, revised that EA, concluded that an EIS will not be prepared, and issued a FONSI. The decision whether to prepare an EIS or issue a FONSI "is a factual determination which implicates agency expertise and accordingly, is reviewed under the deferential arbitrary and capricious standard of review." *Committee to Preserve Boomer Lake Park v. Department of Transp.,* 4 F.3d 1543, 1555 (10th Cir.1993). The plaintiffs contest the Forest Service's decision, alleging that the Forest Service failed to consider properly the "significance" of the timber sale.

"Significantly," as used in NEPA, requires considerations of both "context" and "intensity." *See* 40 C.F.R. § 1508.27. "Context" means the "significance of an action must be analyzed in several contexts such as society as a whole (human, national), the affected region, the affected interests, and the locality[;] [s]ignificance varies with the setting of the proposed action." *Id.* § 1508.27(a). "Intensity" means "the severity of [the] impact." *Id.* § 1508.27(b). The CEQ regulations list several considerations that the Forest Service must weigh in evaluating intensity. *See id.* The plaintiffs maintain that the Forest Service failed to address either the context aspect or intensity factors of 40 C.F.R. § 1508.27. Consequently, they argue, no link exists between the assertions made in the FONSI and those made in the EA that allow the court to evaluate whether the Forest

**6.** To the extent that this claim is really an amalgam of more specific concerns already addressed, the court will not repeat its earlier discussions here.

Service based its ultimate decision on a consideration of the relevant factors.

■ Based upon its review of the administrative record, the court disagrees with the plaintiffs' contention, instead finding that the Forest Service considered the relevant CEQ regulations and took the requisite hard look at the environmental consequences of the timber sale. Accordingly, the Forest Service's determination as to the significance of the proposed action must be upheld. *See Baltimore Gas & Elec. Co. v. Natural Resources Defense Council, Inc.*, 462 U.S. 87, 97–98, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983). Here, the Forest Service properly considered the factors in 40 C.F.R. § 1508.27(a) and disclosed their findings in the FONSI. Moreover, the Forest Service directly referenced the context factor in the FONSI. (AR Tab 170 at 4.) Likewise, the Forest Service addressed the ten intensity factors of 40 C.F.R. § 1508.27(b) in the FONSI. (*Id.* at 5–6.) Nothing requires the Forest Service to repeat in the FONSI the rationale supporting those conclusions. *See* 40 C.F.R. § 1508.13 ("If the assessment is included, the finding need not repeat any of the discussion in the assessment but may incorporate it by reference."). Thus, because it properly analyzed the relevant factors and disclosed the environmental impacts of the timber sale in the Revised EA and then based its issuance of the FONSI on that analysis, the Forest Service's FONSI was not arbitrary and capricious. Consequently, the court grants the Forest Service's motion for summary judgment on that claim.

■ The parties also disagree over the applicability of the provisions of 40 C.F.R. Part 1502 to the Forest Service's Revised EA. The plaintiffs maintain that the provi-

sions of 40 C.F.R. Part 1502 apply when the Forest Service prepares an EA, as it did here, where as the Forest Service maintains that those provisions only apply when it prepares an EIS. In support of their position, the plaintiffs cite *Southern Oregon Citizens Against Toxic Sprays* ("*SOCATS*") *v. Clark*, 720 F.2d 1475 (9th Cir.1983). In *SOCATS*, the Court of Appeals for the Ninth Circuit rejected the defendants' argument that 40 C.F.R. § 1502.22 applied only to the preparation of an EIS, holding that it also applied to the preparation of an EA. *Id.* at 1480. That case, however, involved the application of the "worst case" analysis. In 1986, the CEQ revised 40 C.F.R. § 1502.22, the regulation at issue in *SOCATS*, and did away with the worst case analysis. In doing so, the CEQ made clear that:

> Section 1502.22 is part of the set of regulations which govern the EIS process, as opposed to the preparation of an environmental assessment. *It is only appropriate to require this level of analysis when an agency is preparing an EIS.* The type of analysis called for in § 1502.22 is clearly much more sophisticated and detailed than the scope of an environmental assessment.

51 Fed.Reg. 15,625 (1986) (emphasis in original). Moreover, since the CEQ made that statement, other courts, including the Ninth Circuit, have noted that various provisions of 40 C.F.R. Part 1502 apply to the preparation of an EIS but not the preparation of an EA. *See, e.g., Akiak Native Community v. United States Postal Service*, 213 F.3d 1140, 1147 (9th Cir.2000); *Sierra Club v. Babbitt*, 69 F.Supp.2d 1202, 1214 (E.D.Cal.1999). Thus, the court concludes that the provisions of 40 C.F.R. Part 1502 do not apply to the Forest Service's preparation of the Revised EA.[7]

---

**7.** The court notes that provisions in an EA may be subject to specific provisions in 40

C.F.R. Part 1502 due to Forest Service rules. For example, under the CEQ regulations, an

Consequently, the court will not entertain those claims by the plaintiffs and grants the Forest Service's motion for summary judgment on that issue.

The plaintiffs next allege that the Forest Service has not shown compliance with the provisions of 40 C.F.R. Part 1508 in preparing its Revised EA. In 40 C.F.R. Part 1508, the CEQ sets forth terminology, definitions, and procedures to be used throughout the federal government in preparing NEPA documents, including an EA. In reviewing an agency's actions under the APA, the agency's actions are presumed to be lawful and correct. *See Shenandoah Ecosystems Defense Group v. United States Forest Service*, 24 F.Supp.2d 585, 589 (W.D.Va.1998); *Fener v. Hunt*, 971 F.Supp. 1025, 1031 (W.D.Va.1997). Thus, although the plaintiffs maintain that the Forest Service has not shown compliance with the provisions of 40 C.F.R. Part 1508, the court only will address those provisions within Part 1508 that the plaintiffs specifically pointed to in their complaint; namely, 40 C.F.R. §§ 1508.9 and 1508.27. Moreover, having already addressed the plaintiffs' claims pertaining to § 1508.27, the court will move directly to its discussion of § 1508.9.

Based upon a review of the Revised EA, the court finds that it meets the standards set forth in § 1508.9. The Revised EA contains a brief discussion of the need for the proposal. (AR Tab 133 at 1.) It also contains a discussion of the proposed action and the alternatives considered to the proposed action. (*Id.* at 4–11.) Further, the Revised EA contains a listing of agencies and persons consulted, (*Id.* at 36), and serves as the basis for the conclusion not to prepare an EIS, (AR Tab 170 at 4.) Accordingly, the court grants the Forest Service's motion for summary judgment on that claim.

## VI.

Finally, the court notes that, because the plaintiffs failed to exhaust their administrative remedies, it did not consider two of the plaintiffs' claims.[8] The plaintiffs' complaint about the Forest Service's failure to analyze the cumulative effects of five timber sales has been raised for the first time on this appeal. Although plain-

---

agency must supplement an EIS if "[t]he agency makes substantial changes in the proposed action that are relevant to environmental concerns," or "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c)(1)(i), (ii). Although that regulation only speaks to EISs, the Forest Service applies those same principles to EAs due to its rules. *See* 57 Fed.Reg. 43180, 43200 (1992); Forest Service Handbook § 18.4. However, the court has not found similar rules for the provisions in 40 C.F.R. Part 1502 that the plaintiffs maintain apply to the Revised EA here.

8. Congress has legislated an exhaustion process for challenging "proposed actions of the Forest Service concerning projects and activities implementing land and resource management plans." Forest Service Decision Mak-

ing & Administrative Appeals Reform Act ("Reform Act"), Pub.L. 102–381, Title III, § 322, Oct. 5, 1992, 106 Stat. 1419, *reprinted at* 16 U.S.C. § 1612, note, Section (a). Congress then codified the exhaustion requirement at 7 U.S.C. § 6912(e). Statutory exhaustion requirements are mandatory, and courts are not free to dispense with them. *See Darby v. Cisneros*, 509 U.S. 137, 153–54, 113 S.Ct. 2539, 125 L.Ed.2d 113 (1993); *McCarthy v. Madigan*, 503 U.S. 140, 144, 112 S.Ct. 1081, 117 L.Ed.2d 291 (1992). Moreover, the Forest Service has promulgated regulations at 36 C.F.R. Part 215 implementing the provisions of the Reform Act. Where regulations require exhaustion, "courts reviewing agency action regularly ensure against the bypassing of that requirement by refusing to consider unexhausted issues." *Sims v. Apfel*, 530 U.S. 103, 120 S.Ct. 2080, 2084, 147 L.Ed.2d 80 (2000).

tiff Shenandoah Ecosystems Defense Group commented on cumulative effects in general during their administrative appeal, it did not specifically address the cumulative effects of the five timber sales. Thus, the plaintiffs did not satisfy the regulation that requires plaintiffs to identify meaningfully the issues that they are challenging in their administrative appeal. *See* 36 C.F.R. § 215.14. Accordingly, "[i]t is wholly inappropriate for [the court] to address the Forest Service's handling of an issue that was not previously raised by the plaintiff." *Fener v. Hunt,* 971 F.Supp. 1025, 1037 (W.D.Va.1997). Consequently, the court grants the Forest Service's motion for summary judgment on that claim.

Likewise, the court finds that the plaintiffs failed to exhaust their administrative remedies on their economic analysis claims. In passing, plaintiff Neely references the economic analysis in his administrative appeal. However, that reference is not sufficient to satisfy the exhaustion requirement for the slew of allegations regarding economic analysis issues in the plaintiffs' complaint. None of the specific claims raised in the plaintiffs' complaint was set forth in plaintiff Neely's administrative appeal. Thus, the court cannot consider the plaintiffs' claims regarding economic analysis issues. Accordingly, the court grants the Forest Service's motion for summary judgment on those claims.

### VII.

In sum, this case illustrates the court's important but *limited* oversight role. Here, in making its decision, the Forest Service followed customary procedures in analyzing the environmental effects of the proposed timber sale, relying on trained scientific experts and acceptable methodologies. It is beyond the province of the court to determine whether the Forest Service's decision was prudent or wise;

that is open to considerable debate—a debate that must take place elsewhere. Instead, the court reviews the administrative record to determine whether the Forest Service has taken a hard look at the potential environmental effects of its proposed action before proceeding, and whether the Forest Service has complied with the mandates of NEPA, the NFMA, and implementing regulations. If the Forest Service has done so, then this court's review ends. Based upon the court's review of the administrative record, the court concludes that the Forest Service took the requisite hard look and complied with the applicable statutes and regulations, acting neither arbitrarily nor capriciously.

For the reasons stated, the court dismisses the plaintiffs' ESA claim for lack of jurisdiction. The court also grants the Forest Service's motion for summary judgment on all remaining claims. An appropriate order will be entered this day.

### FINAL ORDER

In accordance with the court's Memorandum Opinion entered this day, it is **ORDERED** and **ADJUDGED** that:

1) Plaintiffs' claim under the Endangered Species Act is **DISMISSED** for lack of jurisdiction;

2) Defendants' motion for summary judgment on all remaining claims is **GRANTED;** and

3) Plaintiffs' motion for summary judgment is **DENIED.**

It is further ORDERED that this action be stricken from the docket of the court.